UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :
                                            :
        - v -                               :        **22 Cr. 590 (PKC)**
                                            :
OKAMI LANDA**,**                            :
                                            :
            Defendant.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### DEFENDANT OKAMI LANDA'S MOTION
### TO SUPPRESS EVIDENCE AND DISMISS THE INDICTMENT

MICHAEL ARTHUS
Federal Defenders of New York, Inc.
Attorney for Defendant
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700

TO:     DAMIAN WILLIAMS
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007
        Attn: AUSAs Nicholas Bradley and Matthew Hellman

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT .........................................................................................1

INTRODUCTION ..............................................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

    A.    The lead-up to the searches. ................................................................2

    B.    The November 30, 2021, probation search. ....................................5

    C.    The warrant to search Mr. Landa's apartment. ...........................7

    D.    The search of the laptop and USB drive. ....................................11

    E.    The second laptop and USB drive search, and the search of the other electronic devices. ................................................................13

ARGUMENT .....................................................................................................................15

    I.    The evidence should be suppressed. ..............................................16

    A.    The probation search was illegal. ..................................................16

          1.    *The probation officers lacked reasonable suspicion to search Mr. Landa's apartment.* ................................................................18

          2.    *Since the probation officers' entry into Mr. Landa's apartment was illegal, the exclusionary rule mandates suppression of all the evidence seized pursuant to the unlawful search and subsequent warrants.* ..............22

    B.    Even if the probation search was lawful, the search warrants were defective. ........................................................................................27

          1.    *The warrant to search Mr. Landa's apartment was defective.* ..............28

          2.    *The warrant to search the laptop and USB drive found during the probation search was defective.* ................................................................35

          3.    *The exclusionary rule should be applied.* ....................................39

    II.    The Court should dismiss the indictment. ..................................42

CONCLUSION ..................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

Coolidge v. New Hampshire, 403 U.S. 443 (1971) .............................................28

Elkins v. United States, 364 U.S. 206 (1960)....................................................22

Hudson v. Michigan, 547 U.S. 586 (2006)..................................................24, 25

Illinois v. Gates, 462 U.S. 213, 238 (1983) ......................................................29

In re Grand Jury Proceedings, 716 F.2d 493 (8th Cir. 1983) ..........................33

Malley v. Briggs, 475 U.S. 335 (1986)..............................................................40

Marron v. United States, 275 U.S. 192 (1927) .................................................33

Murray v. United States, 487 U.S. 533 (1988) ............................................26, 38

Nix v. Williams, 467 U.S. 431 (1984) ................................................................26

Riley v. California, 573 U.S. 373 (2014) ...........................................................39

Samson v. California, 547 U.S. 843 (2006) .......................................................17

Terry v. Ohio, 392 U.S. 1 (1968)........................................................................22

United States v. Abboud, 438 F.3d 554 (6th Cir. 2006) ....................................33

United States v. Alkhabaz, 104 F.3d 1492 (6th Cir. 1997) ...............................42

United States v. Arvizu, 534 U.S. 266 (2002)....................................................17

United States v. Benevento, 836 F.2d 60 (2d Cir. 1987) ...................................30

United States v. Braggs, 5 F.4th 183 (2021) ................................................21, 22

United States v. Buck, 813 F.2d 588 (2d Cir. 1987) .....................................34, 41

United States v. Calandra, 414 U.S. 338 (1974) .........................................22, 24

United States v. Clark, 638 F.3d 89 (2d Cir. 2011)...........................................40

United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162 (9th Cir. 2010)...37

United States v. Diaz, 841 F.2d 1 (1st Cir. 1998) .............................................32

United States v. Galpin, 720 F.3d 436 (2d Cir. 2013)..........................33, 35, 37

United States v. Ganias, 824 F.3d 199 (2d Cir. 2016).......................................35

United States v. George, 975 F.2d 72 (2d Cir. 1992) ........................................33

United States v. Gomez, 652 F. Supp. 461 (E.D.N.Y. 1987) ............................30

United States v. Jackson, 663 Fed. Appx. 31 (2d Cir. 2016)......................16, 17

_United States v. Knights_, 534 U.S. 112 (2001).................................................................. 16, 17

_United States v. Kow_, 58 F.3d 423 (9th Cir. 1995) ...................................................... 33, 41

_United States v. Leon_, 468 U.S. 897 (1984).................................................................. 40, 41

_United States v. Pabon_, 871 F.3d 164 (2d Cir. 2017).........................................................29

_United States v. Reilly_, 76 F.3d 1271 (1996) ....................................................................40

_United States v. Reyes_, 283 F.3d 446 (2d Cir. 2002) .........................................................16

_United States v. Rios_, 881 F. Supp. 772 (D. Conn. 1995)..................................................30

_United States v. Santiago_, No. 15-Cr-892, 2016 WL 954819 (S.D.N.Y. 2016) ...... 21, 43

_United States v. Shipp_, 392 F. Supp. 3d 300 (E.D.N.Y. 2019) ................................. 31, 37

_United States v. Singh_, 390 F.3d 168 (2d Cir. 2004) ........................................................29

_United States v. Stavroulakis_, 952 F.2d 686 (2d Cir. 1992)..............................................43

_United States v. Stock_, 728 F.3d 287 (3d Cir. 2013) ............................................19, 42, 43

_United States v. Voustianiouk_, 685 F.3d 206 (2d Cir. 2012) ............................................28

_United States v. Wey_, 256 F. Supp. 3d 355 (S.D.N.Y. 2017)...................................... 35, 40

_United States v. Winn_, 79 F. Supp. 3d 904 (S.D. Ill. 2015)...............................................37

_United States v. Yuknavich_, 419 F.3d 1302 (11th Cir. 2005) ..........................................17

_United States v. Zavrel_, 384 F.3d 130 (3d Cir. 2004)........................................................21

_United States v. Zemlyansky_, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ....................... 32, 41

_Utah v. Strieff_, 579 U.S. 232 (2016)..................................................................................24

_VonderAhe v. Howland_, 508 F.2d 364 (9th Cir. 1974) .....................................................34

_Watts v. United States_, 394 U.S. 705 (1969).......................................................................19

_Wong Sun v. United States_, 371 U.S. 471 (1963) ....................................................22, 23, 41

**Statutes**

18 U.S.C. § 1038 ......................................................................................... 18, 20, 21, 43

18 U.S.C. § 875.................................................................................................... 18, 19

18 U.S.C. § 876.................................................................................................... 18, 19

**Rules**

Fed. R. Crim. P. 12 .............................................................................................42

Fed. R. Crim. P. 7 ..............................................................................................42

## PRELIMINARY STATEMENT

Defendant Okami Landa hereby moves this Court, pursuant to the Fourth Amendment, Fifth Amendment, Fed. R. Crim. P. 12(b)(3)(C), and Fed. R. Crim. P. 12(b)(3)(B)(v), for an order suppressing any evidence obtained from the unconstitutional searches of his apartment and the electronic devices found therein, and dismissing the indictment for failure to state an offense. Alternatively, he requests an evidentiary hearing.

## INTRODUCTION

In November 2021, an FBI agent received a suspicious looking letter at the Manhattan Field Office. The letter expressed harsh and offensive language, and the envelope contained white powder that, according to the letter, was meant to mimic cocaine.

The FBI investigated the letter and allegedly determined that the stamp on the envelope had been purchased using a credit card belonging to defendant Okami Landa's mother. After being questioned by agents, Mr. Landa, who lived with his mother and was on supervised release, immediately notified his probation officer. Even though the contents of the letter, while offensive, did not violate any criminal laws, a team of probation officers nevertheless descended upon Mr. Landa's apartment and conducted a warrantless search. The probation officers seized a laptop, USB drive, and other items during their unlawful search. After speaking with the probation officer who led the

search, the FBI case agent obtained warrants to search Mr. Landa's apartment, the laptop, and the USB drive Probation had seized. On the USB drive, the agent discovered several files containing alleged child pornography.

Since the probation officers lacked reasonable suspicion to believe Mr. Landa had committed a crime, their warrantless search of Mr. Landa's apartment was unlawful, mandating suppression of all the evidence seized in this case. In any event, even if the probation search was lawful, the subsequent warrants to search Mr. Landa's apartment, the laptop, and the USB drive Probation had seized were defective. Therefore, suppression of the physical evidence and statements in this case should be granted. The Court should further order dismissal of the indictment, since suppression would render the possession of child pornography charge deficient, and since the false information and hoaxes charge is facially defective.

## FACTUAL BACKGROUND

### A. The lead-up to the searches.

In 2016, Okami Landa was convicted of possession of child pornography in the Southern District of New York. He was sentenced to 24 months' imprisonment, followed by 8 years of supervised release. Among his supervised release conditions was participation in a computer monitoring program:

> The defendant shall participate in the Computer/Internet Monitoring Program administered by the U.S. Probation Office. The defendant must provide the U.S. Probation Office advance notification of any computer(s), automated

> service(s), or connected device(s) that will be used during the term of supervision and that can access the Internet.  The U.S. Probation Office is authorized to install any application as necessary to survey all activity on computer(s) or connected device(s) owned or operated by the defendant. . .  The U.S. Probation Office shall be notified via electronic transmission of permissible/suspicious activity or communications occurring on such computer or connected device, consistent with the computer monitoring policy in effect by the probation office.   As triggered by impermissible/suspicious activity, the defendant shall consent to and cooperate with unannounced examinations of any computer equipment owned or used by the defendant.  This examination shall include but is not limited to retrieval and copying of all data from the computer(s), connected device(s), storage media, and any internal or external peripherals, and may involve removal of such equipment for the purpose of conducting a more thorough inspection.

The sentencing court also imposed a search condition:

> The defendant shall submit his person, residence, place of business, vehicle, and any property, computer (as defined in 18 U.S.C. 1030(e)(1)), electronic communications, data storage, devices, and/or other media under his control to a search on the basis that the probation officer has reasonable suspicion that contraband or evidence of a violation of the conditions of the defendant's supervised release may be found.

United States v. Landa, 15-Cr-723, ECF No. 46, at *5 (S.D.N.Y. Dec. 7, 2016).  Mr. Landa commenced his term of supervised release in March 2018.  He participated in a therapy program and had no violations.

On November 15, 2021, FBI Special Agent Aaron Spivack, who had been involved in the investigation leading to Mr. Landa's 2016 conviction, received a letter

while working at the FBI's Manhattan Field Office.  The letter was contained in a business-sized white envelope, and addressed to Spivack in a font clearly generated on a computer word processor.  Ex. B, at USAO_546.  Upon opening the envelope, Spivack found a typed, unsigned letter, dated November 11, 2021, that read:

> Hope you and your ugly cracker children and family get what you deserved, a slow, painful and terminal disease to end your sorry life.
>
> All those illegal acts and those false reports you do behind your supervisor's back will be known, your sorry cunt of mother will be so proud of you.
>
> Happy Thanksgiving
>
> Merry Christmas
>
> Happy New Year, here is some snow/sugar for your nose you corrupt ugly fuck.

White powder fell out of the envelope, leading to Spivack and three other FBI employees being quarantined and taken to the hospital as a precaution.  The powder was ultimately determined to be starch.  Ex. B, at USAO_545-548.

According to Special Agent Jeremy Knudsen, the FBI was able to determine that the stamp on the envelope had been purchased using a credit card belonging to Consuelo Gines.  Knudsen and his partner went to Gines's apartment on November 29, 2021, and spoke with her and her son, Mr. Landa, who also lived there.  Among other things, Mr. Landa told the agents that Gines had bought stamps and given them to an unidentified man in the Bronx a year earlier.  He denied writing the letter, could

not recall whether Spivack was involved in the investigation of his 2016 conviction, and said he would speak to his probation officer about being questioned by the agents.  Ex. B, at USAO_549-551.

That day, Mr. Landa notified his probation officer, Jonathan Bressor, that he had been questioned by the FBI.  Mr. Landa told Bressor that he planned to speak with a lawyer, and gave Bressor Knudsen's contact information.  Bressor then spoke with Knudsen, who revealed the substance of the FBI's investigation.  Bressor responded that Mr. Landa had "made threatening remarks while in the BOP about blowing up Times Square and Federal Plaza."  Ex. E.  Bressor decided to conduct an "independent investigation."  Ex. F.

### B. <u>The November 30, 2021, probation search.</u>

On both November 29 and November 30, Bressor and his partner, Probation Officer Johnny Kim, spoke with Knudsen to "answer questions regarding the allegations."  Ex. F.  After they told Knudsen they had decided to search Mr. Landa's apartment, Knudsen explained what he believed would be "the kinds of evidence that would support the allegation."  Ex. F.

On November 30, 2021, a team of probation officers including Bressor and Kim searched Mr. Landa's apartment.  According to Bressor's notes, the "search was conducted pursuant to a special condition" and was based on the information Knudsen had provided about the Spivack letter.  Ex. G.  The relevant FD-302 indicates that Bressor conducted the search as part of an "independent investigation into the

allegations that [Mr. Landa] had violated the terms of his release by mailing a white powder letter containing threatening language to the FBI." Ex. F.

Mr. Landa, who was alone in the apartment, was cooperative with the officers when they arrived around 5:30 p.m. During the search, the officers seized:

- A black Dell Inspiron laptop, located on the living room desk;

- An orange prescription bottle containing a white powdery substance, located on a wall shelf above the desk;

- A black SanDisk 64-gigabyte USB drive, located next to the living room television; and

- Two white business-sized envelopes, located in the laundry room.

Ex. G.

The officers called Mr. Landa's mother and directed her to return to the apartment. When she arrived, they demanded she give "the password to the Dell laptop in order to assess whether [Mr. Landa] had used the laptop and to view the contents of the SanDisk USB." Id. According to Bressor, Mr. Landa stated during the search that the USB drive contained photos of his deceased dog; Mr. Landa, however, denies having said this. Id.; Ex. A. Bressor later told Knudsen that Mr. Landa admitted using the laptop, which was unmonitored, but the statement does not appear in Bressor's notes. Ex. B, at USAO_552-53; Ex. G.

While they were in the apartment, the officers allegedly saw, but did not seize, a typewriter and printer cartridges. Ex. B, at USAO_553. Although Bressor later told

Knudsen that Mr. Landa said there had been a printer in the apartment that was thrown away six months earlier, the statement does not appear in Bressor's notes.  Id.; Ex. G. At the end of the search, Mr. Landa refused to sign a "COC evidence form."  Ex. G.

Without obtaining a warrant, unidentified law enforcement officers then apparently searched the laptop and USB drive.  Mr. Landa's probation records contain the following entry, dated November 30, 2021, with the author redacted: "New Noncompliance of 'No New Crime (USB device seized, which contained videos of CSAM.)' on 11/30/2021."  Id.[1]

## C. __The warrant to search Mr. Landa's apartment.__

On December 3, 2021 – three days after the probation search – Knudsen applied for a warrant to search Mr. Landa's apartment.  Ex. B.  In the warrant affidavit, Knudsen asserted "that there is probable cause to believe that the Subject Premises contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 875(c) (interstate threats); 876(c) (mailing a threatening communication); and 1038(a) (false information and hoaxes) (the 'Subject Offenses')."  Id. at USAO_545. Knudsen's affidavit was based in part on "conversations with a member of the United States Probation Office" regarding the November 30 search.  Id. at USAO_552.

After summarizing the factual allegations and FBI investigation, Knudsen insisted that there was probable cause to believe Mr. Landa had committed the "subject

---

[1] "CSAM" is an acronym for "child sexual abuse material."

offenses" and had used the apartment in furtherance of their commission.  Id. at USAO_554.  Relying heavily on the results of the probation search, Knudsen, based on his "training, experience, and participation in this investigation," believed Mr. Landa "likely used devices – which may include either or both the Laptop and the Typewriter – to create the Envelope and the Letter."  Id.  He further "believe[d] the white powdery contents of the Pill Bottle appear to be generally consistent with the Powder contained within the Envelope and Letter."  Id.

Knudsen claimed that, since the letter and envelope sent to Spivack were "typewritten or printed," the typewriter and ink cartridges observed during the probation search "may constitute evidence of the commission of the Subject Offenses." Id.  Moreover, based on Knudsen's "training, education, and experience – including my participation in this investigation – I have learned that individuals who engage in the Subject Offenses routinely store physical evidence, fruits, and instrumentalities of their crimes in their residences."  Id.  Although he acknowledged that Probation had already searched Mr. Landa's apartment, Knudsen insisted that, based on his "training, education, and experience," people often hid evidence in hidden areas, locked compartments, closets, and behind ceiling tiles.  Id.  Without revealing what areas the probation officers had searched, whether Mr. Landa's apartment had closets, ceiling tiles, or locked compartments, or how thorough the probation search search had been, Knudsen instead declared his belief that the probation officers might have missed evidence during the earlier search.  Id. at USAO_554-55.

-8-

As a corollary to the warrant, Knudsen sought permission to search electronically stored information ("ESI") contained on any digital devices found during the search. According to Knudsen, based on his "training and experience," it was "likely" that Mr. Landa "created the Letter and Envelope" by using electronic devices such as the Typewriter," and "may have used electronic devices (including but not limited to the Laptop) to research [Spivack's] personal information, location and address, family status, and other personal or professional details reflected in the contents of the Letter and Envelope." Id. at USAO_555.  Knudsen, however, did not provide any basis for believing that Spivack's personal information was available on the internet.  Id.  And again based only on his "training and experience," Knudsen asserted that remnants of electronic files could be recovered years after their creation, could be stored on a hard drive "for years," "there are models of electronic typewriters which also contain electronic memory storage functions," and users who change electronic devices "typically transfer files from the old computer to the new computer, so as not to lose data," often keeping "backups of their data on electronic storage media."  Id. at USAO_555-56.

The same day the application was made, Magistrate Judge Debra Freeman signed a far-reaching warrant authorizing a search for the following:

- Evidence concerning occupancy or ownership of the premises;

- Evidence concerning "the commission of the subject offenses, including preparations, packaging, drafts, notes, addresses, stamps, letters,

envelopes, or other materials related to correspondence, in any format and medium, regarding federal agents, [Spivack], the FBI, or other law enforcement, judicial, correctional, or prosecutive agencies or entities";

- Evidence concerning "the identity or location of, and communications with victims";

- Evidence regarding possession of substances including "white powdery substances, cocaine, chemical and biological agents including anthrax, or attempts to possess the same";

- Evidence of "motivation for the Subject Offenses, including notes, documents, records, photographs, documents, videos, invoices, communications, Internet searches, or correspondence, in any format and medium, regarding federal agents, Agent-1, the FBI, or other law enforcement, judicial, correctional, or prosecutive agencies or entities";

- Evidence of programs designed to delete data from electronic devices;

- Correspondence and records "pertaining to the Subject Offenses," including "envelopes, letters, mailings, electronic mail, chat logs, electronic messages, books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions involving any threats, hoaxes, attempts to use chemical or biological substances or facsimiles thereof, or other acts of violence toward" law enforcement or government agencies;

- Records evidencing "ownership, control, or use of, or access to computer devices, storage media, and related electronic equipment including typewriters and printers used to access, transmit, or store information related to the Subject Offenses"; and

- Evidence "concerning the location of other evidence."

Id. at USAO_565-67.  The Court also authorized the seizure of "any computer devices and storage media that may contain any electronically stored information" falling within

the categories of the warrant, and, if necessary, a "complete review of all the ESI from seized devices or storage media." Id.

The warrant was executed on December 6, 2021. During the search, FBI agents seized: "a typewriter, printer cartridges, various powders, two pieces of paper with written instructions for deleting digital files," an iPad mini, a 32-gigabyte thumb drive, a tablet, two digital cameras, several cell phones, and an SD card. Ex. D, at USAO_605.[2]

## D. **The search of the laptop and USB drive.**

At the same time he applied for a warrant to search Mr. Landa's apartment, Knudsen also applied for a warrant to search the laptop and USB drive the probation officers had seized during the November 30 search. In his warrant affidavit, Knudsen again summarized the factual allegations in the case. With regard to probable cause, however, Knudsen relied entirely on unfounded beliefs and vague assertions about his "training and experience."

As with the application to search Mr. Landa's apartment, Knudsen claimed to "know that individuals who engage in the Subject Offenses often use electronic devices such as the" laptop and USB drive. Ex. C, at USAO_580. Although the letter and envelope were clearly not typed on a typewriter given the font used, and even though the probation officers did not find a printer in the apartment, Knudsen declared it was

---

[2] Exhibits C and D, the search warrant materials for the digital devices, included as exhibits copies of the other search warrant applications made in this case. Those pages have been removed from Exhibits C and D to avoid duplication of materials and reduce the size of the relevant files.

"likely" that Mr. Landa "created the Letter and Envelope by using electronic devices such as the Typewriter or" laptop.  Id.  Mirroring the allegations in the apartment warrant application, and again without citing any case-specific facts, Knudsen added that Mr. Landa "may have used electronic devices (including but not limited to [the laptop]) to research [Spivack's] personal information."  Id.  Knudsen added that Mr. Landa had used the laptop in violation of the terms of his supervised release, and expressed a belief that examining the laptop would provide information about whether and when printers had been attached.  Id. at USAO_580-81.

As for the USB drive, Knudsen claimed to know that the drive could be "used in conjunction with" the laptop and was "likely to have additional stored information that could constitute evidence of the commission of the Subject Offenses, such as saved research or information regarding [Spivack], writings similar to that of the Letter, and information regarding powder-based attacks, threats, and hoaxes."  Id.  He added, speaking entirely in speculative language, that he believed that "partially, automatically, or intentionally saved draft or final versions of documents – such as the Letter or the Envelope – created using word processing or other software may be recovered in a search of [the laptop], as well as in a search of [the USB drive], including because it is a storage device that may have been used in conjunction with [the laptop]."  Id. at USAO_581.  Although he expressed that, in his training and experience, files could be recovered years after their creation from laptops and USB drives, he provided no

support for his theory that any documents had actually been saved on the USB drive or laptop.  Id.

Knudsen sought permission to search the ESI on the laptop and USB drive, revealing that law enforcement could use techniques such as "surveying directories and folders," opening each file, scanning for deleted data and hidden files, and performing keyword searches.  He reiterated, however, that while law enforcement would make "reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant," it might also conduct a "complete review of all the ESI."  Id.

Magistrate Judge Debra Freeman issued a warrant to search the laptop and USB drive for the same categories of evidence as listed in the search warrant for Mr. Landa's apartment.  Id. at USAO_589-91.  The warrant was executed on December 15, 2021, and agents found four videos containing alleged child pornography on the USB drive.

### E. **The second laptop and USB drive search, and the search of the other electronic devices.**

After discovering the alleged child pornography, Knudsen requested another search warrant on December 17, 2021.  He now sought permission to search the laptop, USB drive, and other electronic devices for evidence related not just to the letter sent to Spivack, but also related to possession of child pornography.  According to Knudsen, based on his "training and experience," he knew that child pornography was frequently distributed and collected on the internet using "phones, computers, or other electronic

-13-

devices," and that such devices were used to "access websites used for illegal activity, to communicate with victims and co-conspirators online, and to store child pornography." Ex. D, at USAO_607. Knudsen asserted that people who collect child pornography "often store data on their computers" including "logs of online chats with co-conspirators, emails, contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts." Id.

Without providing any evidence that Mr. Landa had ever created child pornography, Knudsen declared that the digital cameras could be used to "create, view, and store child pornography"; likewise, without providing any evidence that Mr. Landa had ever distributed child pornography, Knudsen insisted that the USB drives and SD card could be "used to store and exchange child pornography." Id. at USAO_607-08. Knudsen concluded that the cell phones, computers, and tablets found in the apartment could also be used in conjunction with child pornography offenses. Id. at 608-09. Knudsen thus sought permission to conduct the same roving search of ESI on all of Mr. Landa's electronic devices that he had included in his previous warrant applications. Id. at 609-10.

Magistrate Judge Gabriel Gorenstein issued a warrant authorizing a search of the electronic devices. On top of the previously-ordered categories of evidence the government was authorized to search for, the warrant permitted the government to search for broad categories of evidence related to child pornography. These included

-14-

"communications with any minor from whom any child pornography . . . is solicited or received"; any "child erotica," specifically defined as "suggestive visual depictions of nude minors which do not constitute child pornography"; any correspondence, digital or otherwise, related to child pornography offenses; and any "diaries" or contact information "related to" child pornography offenses.  Ex. D, at USAO_612-16.

## **ARGUMENT**

The letter that was sent to FBI Special Agent Aaron Spivack – which expressed a hope that he and his loved ones would die – was unquestionably deplorable.  It was not, however, criminal: it did not contain any threats and, since the white powder it contained was clearly intended to mimic cocaine, did not convey false information about the use of a chemical weapon.  Therefore, when probation officers searched Mr. Landa's home for evidence related to the sending of that letter, they lacked reasonable suspicion that Mr. Landa had committed a crime.  Their warrantless search was, then, illegal, making all of the physical evidence and statements in this case subject to suppression.

And even if the probation search was lawful – and it was not – the subsequent warrants to search Mr. Landa's home, the laptop, and the USB drive probation had seized were defective.  The warrant applications failed to establish probable cause that Mr. Landa had committed a crime, and the warrants were overbroad and insufficiently particularized.

Suppression should therefore be granted.  Since suppression would result in the inadmissibility of any evidence that Mr. Landa possessed child pornography, the Court should dismiss count two of the indictment.  And since count one is facially defective given that the letter sent to Spivack did not satisfy the elements of "false information and hoaxes," count one should be dismissed as well.

## I.   **The evidence should be suppressed.**

### A.   **The probation search was illegal.**

Although they have a diminished right to privacy, individuals on supervised release are still protected by the Fourth Amendment.  United States v. Reyes, 283 F.3d 446, 461-62 (2d Cir. 2002).  Particularly when specified by the written supervised release conditions, a probation officer can only search the home of an individual on supervised release if he has "reasonable suspicion" that the individual has committed a crime or violated the release conditions.  United States v. Knights, 534 U.S. 112, 119-21 (2001) (search of probationer's home based on reasonable suspicion upheld since it was imposed as a condition at sentencing); Reyes, 283 F.3d at 461-62 (stressing importance of supervised release conditions, and applying *Knights* reasonable suspicion standard to home searches of individuals on supervised release); see United States v. Jackson, 663 Fed. Appx. 31, 34 (2d Cir. 2016) ("pursuant to the search condition, the Probation Office could search [the defendant's] residence based upon 'reasonable suspicion concerning a violation of a condition or probation or supervised release or unlawful conduct'").

-16-

Reasonable suspicion requires a "sufficiently high probability of criminal conduct" to "make[ ] the intrusion on the individual's privacy interest reasonable." Knights, 534 U.S. at 113. To make this determination, courts "look to the 'totality of the circumstances' to determine whether the officer had a 'particularized and objective basis' to suspect the person searched of criminal activity." Jackson, 663 Fed. Appx. at 33-34 (citations omitted); see also Samson v. California, 547 U.S. 843, 848 (2006). Although requiring less than probable cause or a preponderance of the evidence, reasonable suspicion cannot be based on a "mere hunch." Jackson, 663 Fed. Appx. at 34 (citing United States v. Arvizu, 534 U.S. 266, 274 (2002)). Nor can it be based on an "inchoate and unparticularized suspicion" of criminal activity. United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005). Rather, the government must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Id. at 1311 (citations omitted).

Here, based on the express terms of Mr. Landa's supervised release conditions, the Probation Department was only authorized to search Mr. Landa's home or electronic devices based on "reasonable suspicion that contraband or evidence of a violation of the conditions of [Mr. Landa's] supervised release may be found." United States v. Landa, 15-Cr-723, ECF No. 46, at *5 (S.D.N.Y. Dec. 7, 2016). Considering the totality of the circumstances, the information the Probation Department had on November 30, 2021, fell far short of reasonable suspicion that Mr. Landa had committed a crime or violated the terms of his release.

### 1. **_The probation officers lacked reasonable suspicion to search Mr. Landa's apartment._**

Based on the records the government has provided, the Probation Department's decision to search Mr. Landa's apartment was actually prompted by Mr. Landa's own vigilance in complying with the terms of his supervised release. On November 29, 2021, Mr. Landa – as required by his release conditions – called his probation officer, Jonathan Bressor, to report that FBI agents had just questioned him. Mr. Landa was forthcoming with Bressor about the interaction: he reported that the agents had mentioned a "threatening letter" sent to the FBI, traced the purchase of the stamp on the envelope to his mother's credit card, and had insisted Mr. Landa's "story" that his mother had given stamps to an unidentified man "did not make sense." Ex. E. Bressor then spoke with Special Agent Knudsen, who provided further details about the investigation and the contents of the letter. Id.; Ex. F. The next day, Bressor again spoke with Knudsen, who "answer[ed] questions regarding the allegations." Ex. F. Coordinating with Knudsen about what evidence should be seized, Bressor and a team of probation officers then went to Mr. Landa's to search for evidence "to support the allegation." Id.

There were three potential crimes the FBI and, by extension, Bressor were investigating Mr. Landa for having committed: interstate threats, 18 U.S.C. § 875(c); mailing a threatening communication, 18 U.S.C. § 876(c); and false information and hoaxes, 18 U.S.C. § 1038(a). Ex. B, at USAO_545. Regardless of whether Mr. Landa

sent it, however, the letter did not provide reasonable suspicion that he had committed any of those crimes, since the letter did not violate any of those three statutes.

Initially, the letter did not give rise to reasonable suspicion that Mr. Landa had committed the crimes of interstate threats or mailing a threatening communication. To be guilty of either of those offenses, an individual must transmit in interstate commerce or mail a communication "containing any threat to kidnap any person or any threat to injure the person of another." 18 U.S.C. §§ 875(c), 876(c). The communication must contain a "true threat," rather than the use of mere hyperbolic, "vituperative, abusive, and inexact" language. Watts v. United States, 394 U.S. 705, 708 (1969). As such, the term "threat" only encompasses "communications expressing an intent to inflict injury in the present or future." United States v. Stock, 728 F.3d 287, 293 (3d Cir. 2013).

The letter sent to Spivack, however, contained no threat. Although it expressed a disturbing "hope" that Spivack and his family would contract a terminal disease, it did not express an intent on the sender's part to inflict harm or somehow infect them with a terminal disease. Tellingly, the government did not ultimately indict Mr. Landa for violating either of those statutes. And rightly so: the letter simply did not contain a threat, and thus did not give rise to reasonable suspicion that Mr. Landa had violated either 18 U.S.C. § 875(c) or 18 U.S.C. § 876(c).

Nor did the letter establish reasonable suspicion that Mr. Landa had committed the crime of "false information and hoaxes." An individual commits that crime when he "engages in any conduct with intent to convey false or misleading information under

circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of 46504, section 46505(b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49." 18 U.S.C. § 1038(a)(1). Those cross-referenced subsections, in turn, refer to crimes against aircrafts and vessels, biological and chemical weapons offenses, the use of explosives and firearms, nuclear offenses, and acts of terrorism. Notably absent from 18 U.S.C. § 1038(a)(1) is information intended to create a false impression about a violation of the Controlled Substances Act.

The letter sent to Spivack did not convey false information about any of the types of crimes referenced in 18 U.S.C. § 1038(a)(1), particularly biological or chemical weapons offenses. The government's theory is that, by including white powder in a letter expressing hope that Spivack and his family would slowly die from a terminal disease, the letter was meant to convey the impression that the white powder was a chemical weapon like anthrax. This is, however, simply not the case. The letter explicitly identifies what the sender wanted the white powder to be construed as: cocaine. After referencing "all those illegal acts" Spivack was involved in, the sender wrote, "Happy New Year, here is some snow/sugar for your nose you corrupt ugly fuck." "Snow" and "sugar" for someone's "nose" can only be interpreted as a reference

to cocaine, as these are common slang terms for that particular drug. Since a letter falsely conveying the presence of cocaine or another drug is not criminal under 18 U.S.C. § 1038(a)(1), the letter did not give rise to reasonable suspicion that Mr. Landa committed the crime of "false information and hoaxes."

The holdings in United States v. Santiago, No. 15-Cr-892, 2016 WL 954819 (S.D.N.Y. 2016), and United States v. Zavrel, 384 F.3d 130, 137 (3d Cir. 2004), do not warrant a different outcome. In both of those cases, the courts held that sending white powder in an envelope was sufficient to constitute a threat or a hoax. But in those cases, unlike here, the circumstances gave rise to the reasonable inference that the white powder was a chemical weapon. In *Santiago*, for instance, the accompanying letter was filled with hostile language that made no reference to the white powder. And in *Zavrel*, there was no accompanying letter at all. Here, by contrast, the letter clearly specified that the white powder should *not* be interpreted as a chemical weapon, but as a controlled substance.

The letter that was sent to Spivack was unquestionably disturbing, offensive, and inexcusable. But the contents of that letter were not criminal. Since the face of the letter did not give rise to reasonable suspicion that Mr. Landa had committed a crime, Probation's search of Mr. Landa's apartment was patently illegal.

Nor can the search be upheld under the so-called "special needs exception," which permits probation searches that are "reasonably related to the performance of the officer's duties." United States v. Braggs, 5 F.4th 183, 184-85 (2021). As the

probation records and FD-302s make clear, the only "duty" Bressor was attempting to carry out was investigating Mr. Landa's alleged participation in mailing the letter to Spivack. Since that letter was not criminal, however, sending it would not have violated the terms of Mr. Landa's release. The search of Mr. Landa's apartment for evidence connected to the letter was, therefore, not "reasonably related" to any of Bressor's duties as a probation officer. See id. at 188 (upholding search for evidence of crime, since the criminal conduct would have constituted a violation of release conditions).

### 2. _Since the probation officers' entry into Mr. Landa's apartment was illegal, the exclusionary rule mandates suppression of all the evidence seized pursuant to the unlawful search and subsequent warrants._

The exclusionary rule permits the suppression of evidence obtained pursuant to an unconstitutional search, as well as evidence derived from such unlawful conduct. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). The rule is designed to serve three purposes. First, it is meant to deter police misconduct. Elkins v. United States, 364 U.S. 206, 217 (1960). Second, it protects judicial integrity by preventing the courts from becoming parties to lawless invasions of a citizen's constitutional rights. Terry v. Ohio, 392 U.S. 1, 13 (1968). And third, it promotes the public trust by assuring the public that the government cannot profit from unlawful behavior. United States v. Calandra, 414 U.S. 338, 357 (1974) (Brennan, J., dissenting).

Here, the probation officers' unlawful entry into Mr. Landa's apartment resulted directly in the seizure of the laptop, USB drive, prescription bottle, and envelopes; the

observation of the typewriter and printer cartridges; and the extraction of several statements from Mr. Landa. That evidence then formed the backbone of Knudsen's subsequent warrant applications: he spent several pages discussing the probation search, and argued that the evidence the probation officers seized and the statements Mr. Landa made provided probable cause to believe the apartment, laptop, and USB drive contained evidence of criminal conduct. Ex. B, at USAO_552-55; Ex. C, at USAO_578-81; Ex. D, at USAO_603-07. Since all of the physical evidence seized in this case, as well as several statements, flowed directly from Probation's initial unlawful entry, all of that evidence is subject to suppression. Wong Sun, 371 U.S. at 477-78.

Suppression would serve all three purposes of the exclusionary rule. From a deterrence perspective, suppression is necessary to ensure that Probation never again engages in the kind of suspicionless search it conducted here, which invaded the most intimate and carefully-guarded location in the constitutional scheme: Mr. Landa's home. Indeed, lacking reasonable suspicion that Mr. Landa had either violated his supervised release or committed a crime, Bressor's actions constituted flagrant misconduct completely unrelated to his duties as a probation officer. Likewise, suppression will ensure that the court system is not made a party to such blanket invasions of privacy, which here included a search of Mr. Landa's home by a team of probation officers who seized items, interrogated Mr. Landa, and ordered his elderly mother to return to the apartment and provide them with information, all without reasonable suspicion that Mr. Landa had committed a crime. And suppression would reassure the public, who

are the "potential victims" of such misbehavior, that the government cannot profit from its actions here. See Calandra, 414 U.S. at 357 (Brennan, J., dissenting).

No exceptions to the exclusionary rule exist here. The subsequent search warrants, for instances, did not attenuate the Probation Department's unlawful conduct. Under the attenuation doctrine, unlawfully acquired evidence is admissible only when the "connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance," such that the "interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence." Utah v. Strieff, 579 U.S. 232, 238 (2016) (quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). In evaluating attenuation, courts consider three factors: (1) the temporal proximity between the unconstitutional conduct and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. Strieff, 579 U.S. at 239.

Here, following the illegal probation search, the government obtained several warrants, resulting in searches of Mr. Landa's apartment, the laptop, and the USB drive the probation officers had unlawfully seized. The evidence found pursuant to those searches – especially the alleged child pornography found on the USB drive – was not sufficiently attenuated from the illegal probation search to make it admissible at trial or to avoid application of the exclusionary rule.

First, as to temporal proximity, the searches of the laptop, USB drive, and apartment were executed right on the heels of the illegal probation search. Indeed, Knudsen's warrant applications were made just three days after the probation officers unlawfully entered Mr. Landa's apartment. Since it presumably took time to write the warrant application, and since Knudsen had discussions with Bressor before submitting it, it is clear that there was no temporal break: immediately after Probation completed its illegal search, Knudsen went to work on securing a warrant.

Second, the warrants cannot be considered a meaningful "intervening circumstance." The warrants were not part of some independent investigation divorced from the probation search. Instead, Knudsen coordinated with Bressor before the probation search to instruct Bressor on what kind of evidence he should look for. And the warrants themselves relied heavily on the evidence recovered during the probation search. The warrants, therefore, did not break the "causal connection" between the unlawful probation search and the subsequent seizure of evidence; they were, instead, an integral part of that connection. See Hudson, 547 U.S. at 593.

And third, the purpose and flagrancy of the misconduct do not support applying the attenuation exception. Probation searched Mr. Landa's apartment lacking reasonable suspicion that he had committed a crime or violated the terms of his supervised release. Since the search lacked any constitutional basis and was not reasonably related to the probation officers' duties, Probation's flagrantly unlawful

conduct tainted any subsequent search such that the exclusionary rule should be applied.

Nor can the exclusionary rule be avoided here by resort to the independent source doctrine. Under that doctrine, evidence unconstitutionally acquired may nevertheless be admitted at trial when there exists an "independent source" for its discovery. Nix v. Williams, 467 U.S. 431, 443 (1984). When evidence is acquired during an unlawful entry and later "reacquired" or searched pursuant to a warrant, the question is whether the "later acquisition was . . . the result of the earlier entry." Murray v. United States, 487 U.S. 533, 541 (1988). As the Supreme Court explained in *Murray*, so "long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply." Id. at 542. The Court acknowledged, however, that genuine independence between two seizures "may well be difficult to establish where the seized goods are kept in the police's possession." Id. The Court accordingly set out a two-part test: whether the decision to seek the warrant was "prompted by what [the police] had seen during the initial entry," and whether "information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." Id.

Here —with regard to all of the seized evidence, but particularly with regard to evidence found on the laptop and USB drive – the subsequent search warrants are insufficient to satisfy the independent source doctrine under the *Murray* test. The warrants were clearly "prompted by" what Bressor saw during the illegal entry into Mr.

Landa's apartment.  Knudsen and Bressor coordinated before the probation search about what evidence to look for, and Knudsen immediately sought the search warrants after speaking with Bressor about what the probation search had turned up.

Moreover, the evidence the probation officers seized during the illegal search was "presented to the Magistrate and affected [her] decision to issue the warrant[s]." In his warrant affidavit, Knudsen discussed the probation search and its fruits for nearly three pages, including photographs of the pill bottle, laptop, and USB drive Bressor had seized.  Those seized items – as well as the printer cartridges and typewriter Bressor observed – formed the foundation for Knudsen's argument that there was probable cause to believe the apartment contained evidence to support the hoax charge.  And it cannot be argued that the warrant to search the laptop and USB drive was divorced from the illegal search, since those items were actually seized during the illegal search and "kept in the police's possession."  Id. at 542.

\* \* \*

Individuals on supervised release are still protected by the Constitution.  Here, even measured by the lower standard applied to such individuals, the probation officers who searched Mr. Landa's home lacked reasonable suspicion to believe he had committed a crime.  As a result, the probation search violated the Fourth Amendment, mandating suppression of the physical evidence and statements in this case.

**B.** **Even if the probation search was lawful, the search warrants were defective.**

As explained above, suppression of all the physical evidence and statements in this case is mandated based on the illegality of the probation search – which both resulted in the direct seizure of evidence, and the issuance of warrants tainted by the search's illegality. If the Court were to find that the probation search was lawful, however, suppression is required for another reason: the subsequent warrants – which resulted in the FBI's search of Mr. Landa's apartment, the analysis of the contents of the laptop, and the discovery of child pornography on the USB drive – were defective.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The amendment was enacted to combat the "specific evil" of the "'general warrant' abhorred by the colonists," and to prevent the government from engaging in a "general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). As a result, the constitutional "requirements regarding search warrants are not 'formalities.'" United States v. Voustianiouk, 685 F.3d 206, 210 (2d Cir. 2012) (citations omitted). They are, rather, central to the very concept of liberty.

1. ***The warrant to search Mr. Landa's apartment was defective.***

The warrant issued on December 3, 2021, to search Mr. Landa's home was constitutionally deficient. Initially, the warrant application failed to establish the most basic requirement of the Fourth Amendment: probable cause to believe that Mr. Landa had committed a crime.

A "determination of probable cause to search is not the same as a determination that there is, at the same time, probable cause to arrest, or vice versa." United States v. Pabon, 871 F.3d 164, 181 (2d Cir. 2017). Instead, to obtain a search warrant, the government must establish a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). That is, there must be "a sufficient nexus between the criminal activities alleged" and the places to be searched. United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004).

Here, as discussed above, the allegations in the warrant application failed even to establish reasonable suspicion that Mr. Landa had committed a crime, let alone probable cause. See Pt. I.A.1, supra. The letter sent to Spivack, although abhorrent in its content, did not satisfy the elements of any of the crimes listed in the search warrant application: interstate threats, mailing a threatening communication, or false information and hoaxes. As a result, Knudsen's affidavit did not establish probable cause to believe Mr. Landa had engaged in criminal activity, and thus the warrant authorizing a search for evidence of noncriminal activity was wholly defective.

Even if the warrant application did sufficiently allege criminal conduct, however, it did not establish probable cause to believe that further evidence related to the Spivack letter would be found in Mr. Landa's apartment. In his affidavit, Knudsen conceded that probation officers had already searched Mr. Landa's apartment and recovered a laptop, USB drive, white powder, and envelopes. Knudsen nevertheless insisted that, based on his "training, education, and experience," incriminatory evidence is often

-29-

secreted in closed containers or hidden areas and thus may have been missed during the probation search. Ex. B, at USAO_554-55. Yet Knudsen did not allege any case-specific facts to support his speculative assertion that the probation officers may have overlooked relevant evidence. He did not, for instance, claim that the probation officers' search was less than thorough, or that they had failed to search "locked containers, safes, secret compartments, closets, drawers, above or below ceiling and floor tiles, behind false walls, and in other places." Id. Indeed, Knudsen did not even say that there *were* any locked containers, ceiling tiles, or the like in Mr. Landa's apartment. Id. It is not as though this information about the scope of the probation search or the layout of Mr. Landa's apartment was unavailable to Knudsen: he had specifically instructed Bressor about what to look for during the probation search, and then reviewed the details of that search before submitting the warrant application. Ex. F; Ex. B, at 552-54. Knudsen's reliance on bald allegations about his "training and experience" rather than case-specific facts rendered the search warrant application insufficient. See United States v. Benevento, 836 F.2d 60, 71 (2d Cir. 1987) (agent's expert opinion "standing alone, might not be sufficient" to establish probable cause nexus to search); United States v. Gomez, 652 F. Supp. 461, 463 (E.D.N.Y. 1987) ("training and experience" alone are insufficient to support search warrant; to issue a warrant "based solely on the agent's expert opinion would be to license virtually automatic searches of residences of persons arrested for narcotics offenses"); United States v. Rios, 881 F. Supp. 772, 775 (D. Conn. 1995) (adopting Gomez).

Although the probation officers had not seized the typewriter or printer cartridges Bressor observed, neither was probative of whether Mr. Landa sent the letter to Spivack. Although Knudsen insisted the letter and envelope could have been created on the typewriter, the font on the letter and envelope were clearly produced by a computer. Id. at 5-7, 14. The printer cartridges, meanwhile, were meaningless: the probation officers had already conducted a search and found no printer. To issue a far-reaching search warrant simply to obtain a typewriter that could not have been used to type the letter, and printer cartridges that did not correspond to a printer, would offend the Fourth Amendment.

In addition to lacking probable cause, the warrant to search Mr. Landa's apartment was overbroad. "In determining whether a warrant is overbroad, courts must focus on 'whether there exists probable cause to support the breadth of the search that was authorized.'" United States v. Shipp, 392 F. Supp. 3d 300, 307 (E.D.N.Y. 2019) (citations omitted). Here, however, the warrant authorized a search that went well beyond anything that could have turned up evidence of Mr. Landa's having sent the Spivack letter.

Ostensibly in support of a search for evidence that Mr. Landa had mailed a letter containing white powder, the warrant authorized the government to search through all of Mr. Landa's "notes, documents, records, photographs, documents, videos, invoices, communications, Internet searches, or correspondence, in any format and medium," that in any way related to law enforcement agencies. Ex. B, at USAO_566. It further

-31-

permitted law enforcement to search for evidence of programs designed to delete data from computers, without any case-specific evidence indicating that such programs had been used in this case. The warrant effectively authorized a roving search through all of Mr. Landa's "correspondence and records," as well as the records kept by his mother in their shared home, for evidence of attempts to use "chemical or biological substances" or commit "acts of violence toward federal agencies" – even though the letter sent to Spivack did not contain chemical or biological substances, and did not threaten Spivack with violence. Id. And the warrant even authorized a search for digital devices, including "modems," "personal digital assistants," "smart phones," and "digital cameras," even though such items could not possibly be used in the creation of a letter or the stuffing of an envelope with white powder. Id.

And this search for records, correspondence, "diaries," photographs, videos, and digital devices contained no temporal limitation whatsoever. Indeed, it permitted a search for records, writings, photographs, and videos that could have been created years before or weeks after the alleged conduct took place. See, e.g., United States v. Diaz, 841 F.2d 1, 4-5 (1st Cir. 1998) (warrant authorizing seizure of records that predated first incident of criminality cited in affidavit was overbroad); United States v. Zemlyansky, 945 F. Supp. 2d 438, 458-60 (S.D.N.Y. 2013) (warrant authorizing seizure of all financial information, computers, calendars, and patient appointment records, with no time limitation, overbroad). Given that Knudsen knew the precise date the Spivack letter was dated and mailed, the warrant authorizing a search of items with no temporal

limitation whatsoever was patently overbroad.  See United States v. Abboud, 438 F.3d 554, 576 (6th Cir. 2006) (the "[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad"); United States v. Kow, 58 F.3d 423, 427 (9th Cir. 1995) (warrant improperly allowed seizure of records without limitation to time period when criminal activity took place); In re Grand Jury Proceedings, 716 F.2d 493, 499 (8th Cir. 1983) (fraud in two financial transactions could not support warrant covering entire seven years of bail bondsman's records).

Making matters worse, the warrant lacked particularity.  To satisfy the particularity requirement, a warrant must identify the specific offense for which probable cause exists, describe the place to be searched, and specify the items to be seized in relation to the designated crime.  United States v. Galpin, 720 F.3d 436, 445-46 (2d Cir. 2013).  This requirement is designed to make "general searches . . . impossible and prevent[] the seizure of one thing under a warrant describing another." Marron v. United States, 275 U.S. 192, 196 (1927).  A "failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary."  United States v. George, 975 F.2d 72, 76 (2d Cir. 1992).  Put differently, "as to what is to be taken, nothing is left to the discretion of the officer executing the warrant."  Marron, 275 U.S. at 196.

The warrant here, however, authorized law enforcement to seize broad, generalized categories of information, leaving the determination of what was incriminatory to the agents' discretion. For instance, the warrant permitted a search for any "white powdery substances" – the kind of innocuous item one could expect to find in any kitchen or bathroom in America – with no guidance about what type of powder was being sought. It provided for a search of any evidence "in any format and medium" regarding "federal agents, [Spivack], the FBI, or other law enforcement, judicial, correctional, or prosecutive agencies or entities," without specifying what the contents of those items needed to be to make them "evidence of the motivation for the Subject Offenses." And it permitted the seizure of any "correspondence" regarding "judicial" entities, the kind of non-particularized category of evidence that, in this case, resulted in the seizure of privileged communications between Mr. Landa and his prior defense attorney. Ex. B, at USAO_565-67.

This was, therefore, the very definition of a general warrant: a warrant containing clauses that granted law enforcement the unbridled discretion to conduct a broad, exploratory search for anything it considered to be of evidentiary value. See United States v. Buck, 813 F.2d 588, 591-92 (2d Cir. 1987) (warrant impermissible when it only described charged crimes but gave no limitation on kinds of evidence sought); VonderAhe v. Howland, 508 F.2d 364 (9th Cir. 1974) (probable cause to believe certain documents establishing tax fraud might be found could not authorize search of all books and records of dental practice, along with personal and private papers); United

-34-

States v. Wey, 256 F. Supp. 3d 355, 386 (S.D.N.Y. 2017) (warrant containing no practical guidance for agents to distinguish between materials of evidentiary value and those obviously devoid of it constituted a general warrant).

### 2. **The warrant to search the laptop and USB drive found during the probation search was defective.**

The Fourth Amendment's requirements are particularly important when it comes to searches of digital data, which, in modern society, often contain the most intimate details of a person's life.  In the context of computer hard drives, for instance, the Second Circuit has acknowledged that such seizures "can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure."  United States v. Ganias, 824 F.3d 199, 217 (2d Cir. 2016) (en banc). As such, there is an "enormous" "potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive," a "threat [that] is compounded by the nature of digital storage."  Galpin, 720 F.3d at 447.

The warrant to search the laptop and USB drive found during the probation search fell far short of the standards required under the Fourth Amendment.  First, Knudsen's affidavit did not set out sufficient facts to establish probable cause that Mr. Landa had committed a crime.  See Pt. I.B.1, supra.  Lacking probable cause that Mr. Landa had engaged in criminal conduct, the government had no right to search the laptop or USB drive for evidence of that conduct.

Second, there was insufficient probable cause to believe that evidence of Mr. Landa's having sent the Spivack letter would be found on the computer or, especially, the USB drive. Knudsen, for instance, insisted that Mr. Landa "likely" used the computer to research Spivack's "personal information, location and address, family status, and other personal or professional details reflected in the contents of the Letter and Envelope." Ex. C, at USAO_580. But Knudsen provided no case-specific facts to support this hunch; indeed, he gave provided no evidence that Spivack's personal and family information was even publicly available. And Knudsen asserted that any such hypothetical information – as well as drafts of the letter and envelope – might be saved on the USB drive. Id. But again, Knudsen provided no case-specific facts in support. The USB drive was not connected to the computer, was located on a different side of the living room, and – although he denies saying this – Mr. Landa allegedly told Bressor it contained photographs of his deceased dog. Indeed, Knudsen did not even allege that the USB drive was compatible with the laptop – merely stating in conclusory fashion that it "can be" and "may have been used in conjunction." Id. at USAO_580-81. Such hypothetical and speculative assertions cannot suffice to establish probable cause.

The warrant was, moreover, grossly overbroad. By its terms, the warrant was meant to turn up evidence that Mr. Landa had sent the letter to Spivack. Yet the warrant authorized law enforcement to search for items well beyond documents, including photographs, videos, e-mails, chat logs, and user profiles. There was simply no basis –

at least, no case-specific facts – for allowing a search of videos or photographs to prove that Mr. Landa had typed and sent a document.  See United States v. Winn, 79 F. Supp. 3d 904, 919-20 (S.D. Ill. 2015) (warrant overbroad when it allowed seizure of all files on cell phone, since no explanation in warrant application of how files like calendars and GPS history connected to criminal activity); Shipp, 392 F. Supp. 3d at 309-10 (disapproving of warrant to search through every aspect of Facebook for evidence of § 922(g)(1) violation).  And the warrant authorized a search for these irrelevant categories of evidence with no temporal limitation whatsoever.  See Pt. I.B.2, supra.

Nor was the warrant to search the laptop and USB drive sufficiently particularized.  Warrants to rummage through digital data raise grave particularity concerns.  Given the sensitivity of personal information stored online, the "potential for privacy violations occasioned by an unbridled, exploratory search" of such data is "enormous."  Galpin, 720 F.3d at 446-47.  That "threat is compounded by the nature of digital storage," since, unlike in searches of homes or similar locations, the limitations imposed by the physical dimensions of places where evidence can be found "are largely absent" in the digital realm.  Id. at 447.  This creates the "serious risk that every warrant for electronic information will become, in effect, a general warrant."  Id. (quoting United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc)).  The Second Circuit has held that "[t]his threat demands a heightened sensitivity to the particularity requirement in the context of digital searches."  Galpin, 720 F.3d at 447.  Here, as with the warrant to search Mr. Landa's apartment, the warrant

to search the laptop and USB drive authorized the agents to search for broad categories of evidence, and thus likewise failed to adequately cabin the executing agents' discretion. See Pt. B.1, supra.

The "inevitable discovery" doctrine cannot salvage the illegal search of the laptop and, especially, the USB drive.  Murray, 487 U.S. at 539 (evidence admissible when, although acquired unlawfully, it would have inevitably been discovered by lawful means).  The Probation Department would not have inevitably *lawfully* discovered the images of child pornography found on the USB drive.  The probation officers' authority to search the USB drive was limited to two circumstances: reasonable suspicion that contraband would be found, and reasonable suspicion that evidence of a violation of the conditions of supervised release would be found.[3]  Since the USB drive was not connected to the laptop, Probation would not have had reasonable suspicion to believe that the USB drive contained evidence either that the laptop had been used to access the internet or that Mr. Landa had written the letter to Spivack.  And the USB drive itself – which was not connected to the laptop, and was located on the other side of the room – was not, standing alone, a device that "can access the Internet."  In any event, Probation's search could only have been conducted "in a reasonable manner."  If Probation wished to search the USB drive for evidence that Mr. Landa had sent the

---

[3] The separate "Computer/Internet Monitoring Program" condition only authorized seizure and examination of computer equipment if first triggered by "impermissible/suspicious activity" alerted by the monitoring device.  That did not happen here, since the laptop and USB drive were unmonitored.

Spivack letter or accessed the internet, opening video files would have been a patently unreasonably way to do so.

### 3. ***The exclusionary rule should be applied.***

Application of the exclusionary rule is an appropriate remedy for the illegal searches conducted pursuant to the warrants, for the same reasons as presented with regard to the illegal probation search.  <u>See</u> Pt. I.A.3, <u>supra</u>.  In fact, application of the exclusionary rule may be even *more* warranted, given the flagrancy of law enforcement's misconduct.  Based on the probation records the government has provided, it appears that probation officers searched the USB drive without a warrant on November 30 and discovered child pornography.  Ex. G.  Since they had no basis to search the USB drive without a warrant, <u>see</u> Pt. I.B.2, <u>supra</u>, that search was patently unconstitutional.  <u>See Riley v. California</u>, 573 U.S. 373 (2014) (warrant required to search electronic devices like cell phones).

After speaking to the probation officers, however, Knudsen immediately sought a search warrant for the USB drive, apparently in an effort to cure the officers' illegal actions.  Indeed, the fact that Probation had already discovered child pornography during an illegal search helps to explain why Knudsen's warrant applications sought permission to search for items – like videos, photographs, and digital cameras – that were so obviously unconnected to the question of whether Mr. Landa had sent the Spivack letter.  Under the circumstances, and given the flagrant misconduct on the part of law enforcement here, application of the exclusionary rule is particularly warranted.

"These are precisely the sort of circumstances, rare or not, that call for blanket suppression." Wey, 256 F. Supp. 3d at 410.

The government cannot rely on the "good faith exception" to sustain the warrants. Under that (much-criticized) rule, suppression is considered inappropriate when an officer acts in "reasonable reliance on a search warrant issued by a detached and neutral magistrate." United States v. Leon, 468 U.S. 897, 900 (1984). "Good faith," however, "is not a magic lamp for police officers to rub whenever they find themselves in trouble." United States v. Reilly, 76 F.3d 1271, 1280 (1996). The exception is, instead, wholly inapplicable when a warrant or supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923 (citations omitted).

As discussed earlier, the warrants and accompanying affidavits failed to establish even reasonable suspicion, much less probable cause, that Mr. Landa had committed a crime. As such, no FBI agent could have relied on the warrants in good faith. See Malley v. Briggs, 475 U.S. 335, 345-46 (1986) (officer could not rely on good faith exception when he knew he lacked probable cause to make warrant application); United States v. Clark, 638 F.3d 89, 103-04 (2d Cir. 2011) (good faith inapplicable when officer filed barebones affidavit that was "almost calculated to mislead") (citations and quotations omitted).

Likewise, the good faith exception does not apply when a "warrant is so facially deficient – i.e., in failing to particularize the place to be searched or the things to be

seized – that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923. Here, prior cases have repeatedly condemned warrants containing language of the type at issue in this case. For instance, it is well-settled that it is unconstitutional to issue warrants allowing for the analysis of all documents, Kow, 58 F.3d at 428-29; warrants containing catch-all descriptions of evidence to be seized, Buck, 813 F.2d at 593 n.2 ("with respect to searches conducted hereafter, police officers may no longer invoke the reasonable-reliance exception . . . [to] the fruits of searches undertaken on the basis of warrants containing only a catch-all description of the property to be seized"); and warrants lacking meaningful temporal or content-based limitations. Zemlyansky, 945 F. Supp. 2d at 465, 472 (finding deterrence necessary given obvious overbreadth of warrant; "the good faith exception should not be read so as to 'swallow the exclusionary rule'") (citations omitted).

Accordingly, application of the exclusionary rule is warranted in this case. The Court should, therefore, order suppression of all the fruits of the defective search warrants. This includes evidence seized pursuant to the warrant issued on December 17, 2021, which supplemented the earlier warrant applications to permit a search for evidence of child pornography. That warrant was indisputably a direct fruit of the execution of the unlawful warrant to search the laptop and USB drive.[4] Wong Sun, 371 U.S. at 477-78.

---

[4] The government has not disclosed any evidence obtained from the digital devices seized pursuant to the apartment search warrant. Ex. D. Should the government disclose evidence from those devices, Mr. Landa requests permission to supplement this motion.

II.    <u>**The Court should dismiss the indictment.**</u>

An indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). When an indictment is defective by, for instance, failing to state an offense, it is subject to dismissal. Fed. R. Crim. P. 12(b)(3)(B)(v).

Here, if suppression is granted, then count two of the indictment must be dismissed. That count charges "possession of child pornography" that was found on the USB drive seized during the probation search. If the evidence found on the USB drive is suppressed, however, then count one by definition would fail to state an offense, rendering it subject to dismissal.

And regardless of the outcome of the suppression motion, count one is subject to dismissal. A count of an indictment can fail to state an offense "in at least two ways." <u>Stock</u>, 728 F.3d at 292. First, it can fail to charge an essential element of a crime. <u>Id.</u> In Mr. Landa's case, however, the indictment clearly alleges the elements of the crime of false information and hoaxes by parroting the statutory language.

Second, however – and relevant to Mr. Landa's case – an indictment fails to state an offense when "the specific facts alleged . . . fall beyond the scope of the relevant criminal statute." <u>Id.;</u> <u>see also</u> <u>United States v. Alkhabaz</u>, 104 F.3d 1492, 1493 (6th Cir. 1997). This basis for dismissal is often applied in the context of allegedly threatening language, of the type at issue in count two of the indictment against Mr. Landa. <u>Stock</u>, 728 F.3d at 292; <u>Alkhabaz</u>, 104 F.3d at 1493; <u>but see</u> <u>United States v. Santiago</u>, No. 15-

Cr-892, 2016 WL 954819, at *2 (S.D.N.Y. 2016) (refusing to apply *Stock* and *Alkhabaz*). Although an indictment is not required to allege specific facts, when it does, it "must be read to include facts which are necessarily implied by the specific allegations made." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (citations omitted).

In this case, the false information and hoaxes count alleges that Mr. Landa violated 18 U.S.C. § 1038(a)(1) by mailing the Spivack letter. As detailed above, however, the Spivack letter did not violate that statute, since it did not contain false information about the use of a chemical or biological weapon. See Pt. I.A.1, supra. Accordingly, count two fails to state an offense, and must be dismissed. Stock, 728 F.3d at 292.

## CONCLUSION

For the reasons stated above, the Court should suppress the evidence seized in this case, and should dismiss the indictment.

Dated: May 19, 2023                          Respectfully submitted,
      New York, New York

                                                _____/s/_____

                                                Michael Arthus, Esq.
                                                Federal Defenders of New York
                                                52 Duane Street, 10th Floor
                                                New York, NY 10038
                                                (212) 417-8760