UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -                                          22 Cr. 590 (PKC)

OKAMI LANDA,

                    Defendant.


# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT OKAMI LANDA'S PRETRIAL MOTIONS


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007


Matthew J.C. Hellman
Nicholas S. Bradley
Assistant United States Attorneys
        *-Of Counsel-*

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     BACKGROUND ................................................................................................... 2

        A.      The November 15, 2021 Powder Threat ............................................... 2

        B.      The FBI Traces the Stamp to the Defendant's Residence and Interviews
                the Defendant ...................................................................................... 3

        C.      The Defendant's 2016 Conviction for CSAM Possession ..................... 9

        D.      The Defendant's Conduct on Supervised Release ............................. 10

        E.      November 30, 2021 Probation Search of the Residence..................... 11

        F.      The FBI Search Warrants for the Residence and Devices ................... 14

                1.      December 3, 2021 Premises Warrant ..................................... 14

                2.      December 3, 2021 Laptop and USB Warrant .......................... 15

                3.      December 17, 2021 Devices Warrant...................................... 16

        G.      Procedural History ............................................................................ 17

        H.      The Defendant's Jail Call Admissions ............................................... 18

III.    ARGUMENT ...................................................................................................... 18

        A.      The Indictment Properly Alleges that the Defendant Violated 18 U.S.C.
                § 1038(a) ......................................................................................... 19

                1.      Applicable Law..................................................................... 19

                2.      Discussion ........................................................................... 19

        B.      The Probation Search Was Reasonable.............................................. 23

                1.      Applicable Law..................................................................... 23

                2.      Discussion ........................................................................... 28

        C.      The Warrants Were Supported by Probable Cause ............................. 30

                1.      Applicable Law..................................................................... 30

                2.      Discussion ........................................................................... 32

        D.      The Warrants Were Sufficiently Particularized and Not Overbroad.... 34

        1.      Applicable Law ................................................................................. 34

        2.      Discussion ........................................................................................ 36

    E.     The Charges in the Indictment Should Be Tried Together ...................................... 38

        1.      Applicable Law ................................................................................. 38

        2.      Discussion ........................................................................................ 41

    F.     No Evidentiary Hearing Is Necessary ................................................................... 44

IV.  CONCLUSION ............................................................................................................ 45

The Government respectfully submits this memorandum of law in opposition to the pretrial motions of defendant Okami Landa (i) to suppress all evidence obtained from searches of the defendant's apartment and dismiss the Indictment (Dkt. No. 12), and (ii) for severance (Dkt. No. 14).

## I.     PRELIMINARY STATEMENT

In November 2021, the defendant sent a threatening letter containing a white powder to a Special Agent of the Federal Bureau of Investigation ("FBI") who had interviewed and arrested him in connection with the defendant's 2016 conviction for possession of child sexual abuse materials ("CSAM"). The threatening letter sent by the defendant that accompanied the powder referenced the Special Agent, his children, and his family getting what they "deserved, a slow, painful and terminal disease to end your sorry life." During a search by the United States Probation Office (the "Probation Office") of the defendant's residence (the "Residence"), probation officers seized a laptop and USB drive, which contained multiple videos with CSAM.

The defendant's suppression and dismissal arguments depend on the legally unsupported and meritless claim that sending a threatening powder letter is not a crime or a violation of supervised release conditions and, as such, the investigative steps taken by the Probation Office and the FBI were improper. The Indictment properly alleges a violation of the false information and hoaxes statute, and the defendant's arguments to the contrary are squarely matters for the jury. Moreover, the Probation Office had ample reasonable suspicion under the defendant's search condition to search the Residence upon learning his connection to the threatening letter. The FBI search warrants were well supported by probable cause and clearly limited to evidence of the subject offenses being investigated. On severance, the defendant cannot show substantial prejudice given the closely related evidence across the counts charged in the Indictment. For the

reasons explained below, the Court should deny the defendant's motions in their entirety without an evidentiary hearing.

## II.    BACKGROUND

### A.    The November 15, 2021 Powder Threat

On November 15, 2021, while working inside a forensic facility at the FBI's offices in 290 Broadway in Manhattan, a particular FBI Special Agent ("Victim-1") received an envelope via U.S. Mail addressed to him that contained a threatening message and a white powder substance. (Def. Supp. Mot. (Dkt. No. 12) Ex. D (December 17, 2021 search warrant affidavit, described below as the "Devices Warrant") ¶ 5(a).) Victim-1 is assigned to a squad responsible for investigating crimes against children, including offenses related to child pornography or CSAM. (*Id.*) Upon opening the letter, the powder spilled out onto the floor and other surfaces, which prompted a response from the FBI's weapons of mass destruction and emergency response teams. (*Id.* ¶ 5(c).) Victim-1 and three other FBI employees in the area were hospitalized for medical evaluation following the exposure to the powder. (*Id.*)

The envelope was addressed to Victim-1 at nearby 26 Federal Plaza. (*Id.* ¶ 5(a).) The addressee and return address information were printed onto the envelope. (*Id.*) The return address printed on the envelope was the name and address of the New York State Civil Supreme Court located at 60 Centre Street. (*Id.*) Notably, a postage stamp with a unique serial number and printed scan code (the "Stamp") was affixed to the envelope. (*Id.*) The unsigned letter inside the envelope contained the following printed message:

"To [Victim-1]:

Hope you and your ugly cracker children and family get what you deserved, a slow, painful and terminal disease to end your sorry life.

All those illegal acts and those false reports you do behind your supervisor's back will be known, your sorry cunt of mother will be so proud of you.

2

Happy Thanksgiving

Merry Christmas

Happy New year, here is some snow / sugar for your nose you corrupt ugly fuck."

(*Id.* ¶ 5(b).)

Upon seeing the letter and the white powder substance that fell out of the envelope, Victim-1 immediately notified other FBI personnel. (*Id.* ¶ 5(c).) Victim-1 and other FBI employees exposed to the envelope and powder were isolated and quarantined at a hospital for observation. (*Id.*) The FBI forensic laboratory was immediately closed and sealed until a HAZMAT team entered the lab, recovered the envelope, letter, and powder, and ultimately deemed the laboratory safe. (*Id.*) Subsequent analysis, including from laboratory reports produced in discovery, determined that the powder was an inert substance containing starch. (*See id.*)

### B.    The FBI Traces the Stamp to the Defendant's Residence and Interviews the Defendant

The FBI's investigation traced the unique serial number on the Stamp to the defendant's Residence. Specifically, the United States Postal Service ("USPS") maintains certain transaction records involving products such as stamps, including the serial numbers affixed to postage like the Stamp on the envelope sent to Victim-1. (*Id.* ¶ 6.) Based on a review of these transaction records, the FBI determined that the booklet containing the Stamp was purchased at a USPS kiosk in midtown Manhattan on or about September 24, 2020. (*Id.*) Additionally, the credit card used to purchase the Stamp belonged to the defendant's mother, who resided with the defendant at the Residence. (*Id.* ¶¶ 6-7.)

On or about November 29, 2021, two FBI agents, including Special Agent Jeremy Knudsen, visited the Residence to conduct a voluntary interview of the defendant and his mother,

Consuelo Gines. (*Id.* ¶ 8.) During that interview, which was recorded, in substance and in part, the defendant stated that his mother had purchased stamps at the request of an unknown person in the Bronx on East 149th Street who did not have money to buy stamps himself. (*Id.*) The defendant claimed that this unknown person may have used the Stamp. (*Id.*) The defendant further denied sending the threatening letter to Victim-1 and claimed he did not recognize the letter when it was shown to him. (*Id.*) The defendant also admitted he had previously been imprisoned on child pornography charges, though he claimed he did not recall whether Victim-1 or the FBI was involved in his case; only that he knew the agents who came to his home and arrested him (one of which was in fact Victim-1). (*Id.*) The defendant also stated that he was on probation and would notify his probation officer that he was contacted by the FBI. (*Id.*)

Relevant excerpts of a draft translation of the FBI's interview of the defendant and his mother (which was conducted principally in Spanish) are attached as Exhibit A. When the FBI agents initially asked Gines what she did with her stamps and whether she gave them to someone else, Gines responded "No, no . . . I don't know. I . . . I use stamps sporadically." (Ex. A at 1.) When asked if anyone else had access to her stamps, Gines said "only my son." (*Id.* at 2.) As detailed below, the defendant then claimed that a year ago an unknown individual asked his mother for stamps in the Bronx. As he told this story, the defendant prompted his mother in Spanish on multiple occasions to corroborate these supposed events, which she did not recall or endorse. Relevant excerpts from Exhibit A are displayed below, with the draft translations in the center column:

| OKAMI LANDA: | There was… there was, uh… there was a… a time, like, a… a year ago. There was this guy who wanted to buy stamps and my mother… I… it was when that… this man who asked you to buy | *There was… there was, uh… there was a… a time, like, a… a year ago. There was this guy who wanted to buy stamps and my mother… I…* fue cuando |

| | | |
|---|---|---|
| | stamps, but I don't… I don't know if it could be that. | ese… el hombre este que pidió que compraras las estampillas, pero no s… no sé si sería eso. |
| CONSUELO GINES: | Hum. | Jum. |
| OKAMI LANDA: | I don't know if it was that guy. I don't know what… what happened, but… | *I don't know if it was that guy. I don't know what… what happened, but…* |
| CONSUELO GINES: | I don't know anything about that… | Yo no sé nada de eso… |

The defendant's mother explained that she could not recall the specifics of how she bought the stamp booklet in question, and that "I usually buy the stamps and put them away for when I need them very sporadically." (Ex. A at 7.) Gines later said "I haven't given stamps to anyone," including in the last year. (*Id.* at 14.) When the agents asked about the defendant's claim that a third party asked Gines to buy stamps a year ago, the defendant repeatedly prompted his mother in Spanish to endorse the story:

| | | |
|---|---|---|
| OKAMI LANDA: | Well, again, it was like here in the… in the post office right here in, uh… 149th and it was, you know, it was a guy. But, you know, it was one of those things that he doesn't have any change and it was one of those things that… "O.K. well…" We had a… my mother… I think you gave them the credit card, or did you buy it like that there? | *Well, again, it was like here in the… in the post office right here in, uh… 149th and it was, you know, it was one of those things that he doesn't have any change and it was one of those things that… "O.K. well…" We had a… my mother…* creo que le diste la tarjeta de crédito, ¿o la compraste así ahí? |

| | | |
|---|---|---|
| CONSUELO GINES: | The thing is that I don't remember. I don't know… | Es que no recuerdo. No sé… |
| | | |
| OKAMI LANDA: | With this, with what happened over there… what I'm telling him in the… at 149 when we saw that guy who was asking for money for the stamps… yeah. So, yeah. | En esto de lo que pasó fue de allá… lo que le estoy comentando en el… la 149 cuando vimos al tipo ese que estaba pidiendo plata para lo de las estampillas… *yeah. So, yeah.* |
| AGENT JEREMY KNUDSEN: | O.K. 'Cause if people asked to buy things from me, I'm like, "Don't talk to me." | *O.K. 'Cause if people asked to buy things from me, I'm like, "Don't talk to me."* |
| OKAMI LANDA: | Yeah. | *Yeah.* |
| AGENT JEREMY KNUDSEN: | So… so… strange people. I'm like, "Oh, don't talk to me." Uhm, O.K. Do you remember what the person looked like? Do you have any recollection of, like… does… like… like, was it a white person? A… a black, brown, what… any idea? Like what… remember? To… | *So… so… strange people. I'm like, "Oh, don't talk to me." Uhm, O.K. Do you remember what the person looked like? Do you have any recollection of, like… does… like… like, was it a white person? A… a black, brown, what… any idea? Like what… remember? To…* |
| OKAMI LANDA: | Do you remember… | Que si se acuerda… |
| CONSUELO GINES: | I don't remember. | *I don't remember.* |

| AGENT JEREMY KNUDSEN: | … describe them? | *… describe them?* |
|---|---|---|
| OKAMI LANDA: | … what [skin] color the man was. The… the man who bought the stamps. | … de qué color era el hombre. El… el hombre que compró las estampillas. |
| AGENT JEREMY KNUDSEN: | Tall, short… | *Tall, short…* |
| CONSUELO GINES: | Uh, they… | Eh, ellos… |
| AGENT JEREMY KNUDSEN: | … [U/I]? | *… [U/I]?* |
| CONSUELO GINES: | … they're… whe… where I bought them? | … están… a… ¿a dónde las compré? |
| OKAMI LANDA: | Yes. | Sí. |
| CONSUELO GINES: | They're at a window with… with gates like this and a… you pay there and you… you can't even see them. I mean… | Ellos están en una ventana con… con rejas así y una… uno ahí paga y ni… ni los ve. O sea… |
| OKAMI LANDA: | No, the man who… who… who asked for the stamps. What color...? He was like black. A black guy… he was like… | No, pero el hombre que… que… que pidió las estampillas. ¿De qué color…? Era como moreno. Un moreno… *he was like…* |

| CONSUELO GINES: | I don't remember. | Yo no recuerdo. |
|---|---|---|
| | | |
| OKAMI LANDA: | … if the man… the man that bought the stamps on… on your behalf, did he speak Spanish? The one who… | … que si el hombre… el hombre que compró las estampillas de… de parte suya, que si él hablaba español. El que… |
| CONSUELO GINES: | No. | No. |
| OKAMI LANDA: | … the black guy who approached us. | … el moreno que se nos acercó. |
| CONSUELO GINES: | No, no, no. Creo que no.[1] | No, no, no. Creo que no. |
| OKAMI LANDA: | He wasn't Hispanic? | ¿No era hispano? |
| CONSUELO GINES: | I don't remember. | Yo no me recuerdo. |

On one occasion, the defendant appeared to mistranslate his mother's statements to the agents in an effort to suggest that her recollection was consistent with the defendant's story about purportedly giving stamps to a third party in the Bronx:

---

[1]    This statement, which means "I think not," was not translated into English in the draft translation.

| CONSUELO GINES: | I… the only thing I can think of is that perhaps I bought them, and someone had tampered with them before. Meaning… | Me… lo único que puedo pensar es que de pronto yo las compré y que alguien me las manipuló antes. O sea… |
|---|---|---|
| OKAMI LANDA: | Right. | *Right.* |
| CONSUELO GINES: | … I don't know. | … no sé. |
| OKAMI LANDA: | Yes, uh… what it is, is that… she believes is that she paid for those and that someone who she gave them to u… used them for this. | Sí, eh… *what it is, is that… she believes is that she paid for those and that someone who she gave them to u… used them for this.* |

Finally, when the FBI agents told the defendant that his story did not make sense because the stamp booklet in question was purchased at the post office near Penn Station, the defendant told the agents that they needed to call his attorney. The defendant then told his mother, in Spanish, that "they're here trying to put this . . . that we don't know what is, on us." (Ex. A at 26-27.)

### C.    The Defendant's 2016 Conviction for CSAM Possession

In fact, as noted, Victim-1 interviewed the defendant and was present for his arrest in 2015 for possessing CSAM. In or about June 2015, Victim-1 and other FBI agents executed a search warrant on the Residence. (Def. Supp. Mot. Ex. D ¶ 9(a).) The defendant initially barricaded himself inside his bedroom, and the agents had to break the door to gain entry. (*Id.*) While inside the Residence, Victim-1 interviewed the defendant, who admitted to his involvement in CSAM-related offenses. (*Id.* ¶ 9(b).) Victim-1 and other FBI personnel also

recovered CSAM on the defendant's devices that were seized from inside the Residence. (*Id.* ¶ 9(c).) The defendant was arrested and subsequently pleaded guilty to possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). (*Id.* ¶¶ 9(d)-(e).) On or about November 30, 2016, Judge Woods sentenced the defendant to 24 months' imprisonment, followed by eight years of supervised release. (*Id.* ¶ 9(f).). The defendant's supervised release included the following search conditions:

> The defendant shall participate in the Computer/Internet Monitoring Program administered by the U.S. Probation Office. The defendant must provide the U.S. Probation Office advance notification of any computer(s), automated service(s), or connected device(s) that will be used during the term of supervision and that can access the Internet. The U.S. Probation Office is authorized to install any application as necessary to survey all activity on computer(s) or connected device(s) owned or operated by the defendant.

> The defendant shall submit his person, residence, place of business, vehicle, and any property, computer (as defined in 18 U.S.C. 1030(e)(1)), electronic communications, data storage, devices and/or other media under his control to a search on the basis that the probation officer has reasonable suspicion that contraband or evidence of a violation of the conditions of the defendant's supervised release may be found.

> *See United States v. Okami Landa*, 15 Cr. 723 (GHW), Dkt. No. 46 (S.D.N.Y.).

**D.    The Defendant's Conduct on Supervised Release**

The defendant began his eight-year term of supervised release on or about March 30, 2018. Prior to his release, the Bureau of Prisons ("BOP") reported that the defendant made multiple homicidal statements during an appointment with a psychology extern. Specifically, when discussing how his computer and videogame habits would be restricted while under supervised release, the defendant stated he should blow up Times Square on New Year's, because if he could not enjoy his life, then he did not understand why other people should. (Def. Sev. Mot. (Dkt. No. 14) Ex. B (December 28, 2017 email from BOP Staff psychologist).) The defendant also stated, "I should blow up Federal Plaza because I hate the feds and they ruined

my life." (*Id.*) The defendant acknowledged he could hurt himself carrying out such a plan, but claimed it would be worth it. (*Id.*) At the end of the session, the BOP extern asked the defendant if he was having thoughts about harming anyone, to which he replied, "Not unless you can give me an AK-47." (*Id.*)

While under supervision, the Probation Office noted that the defendant's participation and engagement had been poor in sex offense-specific treatment, including as recently as November 2021. (VOSR Report and Memorandum dated January 3, 2022 in 15 Cr. 723 "VOSR Mem." at 2.) The Probation Office also explained that the defendant's "overall attitude has included hostility and resentment, which was largely problematic and a barrier to effective treatment and supervision engagement. Throughout the course of treatment, he felt mistreated, victimized by the Government and, as such, would respond with anger and hostility." (*Id.* at 3 (describing "simmering grievance" "observed throughout treatment against the government," and "reflexively blam[ing] the government for putting him in this position").) Probation Office records produced in discovery also note instances of the defendant's noncompliance, including being dishonest with his probation officer in September 2020 (USAO_000453), and the use of an unmonitored phone with internet connectivity in October 2020 (USAO_000458).

### E.    November 30, 2021 Probation Search of the Residence

Following the November 29, 2021 interview with the FBI agents at the Residence, the defendant contacted his probation officer, Jonathan Bressor, to report his law enforcement contact, as required by his release conditions. (Def. Supp. Mot. Ex. E (Excerpts from Probation Office supervision records).) Officer Bressor then spoke with Special Agent Knudsen, who told Officer Bressor about the FBI's investigation into a letter containing threatening language and a white powder substance addressed to an FBI agent in the sex crimes unit at the New York Field Office. (Def. Supp. Mot. Ex. E, Ex. F (December 2, 2021 FBI report).) Special Agent Knudsen

told Officer Bressor that the Stamp used to mail the letter was purchased using a credit card belonging to the defendant's mother. (*Id.*) Special Agent Knudsen also interviewed the defendant, and assessed that the defendant's story about giving stamps to someone else near the post office did not make sense. (*Id.*) Officer Bressor explained that the defendant had previously made threatening remarks while in BOP custody about blowing up Times Square and Federal Plaza. (Def. Supp. Mot. Ex. E.) The FBI's summary of the conversation noted that Officer Bressor stated that the defendant "made threats against the FBI in the past," and that the Probation Office "would conduct an independent investigation into the allegations that LANDA had violated the terms of his release by mailing a white powder letter containing threatening language to the FBI." (Def. Supp. Mot. Ex. F.) Officer Bressor later informed Special Agent Knudsen that the Probation Office would conduct a probation search of the Residence. (*Id.*)

In sum, at the time of the Probation Office's search of the Residence, it is undisputed that the Probation Office knew the following:

- An FBI special agent in the sex crimes unit at the New York Field Office received a letter on or about November 15, 2021 containing threatening language and a white powder substance.

- The Stamp used to send the letter was purchased using a credit card belonging to the defendant's mother, who lived with the defendant at the Residence.

- The FBI interviewed the defendant at his Residence regarding the letter and, in Special Agent Knudsen's assessment, the defendant's explanation did not make sense.

- The defendant had previously made threats against the U.S. Government, including blowing up Federal Plaza, which is the location of the headquarters of the New York Field Office of the FBI.

- The defendant's term of supervised release included a search condition (including his residence, property, computer, data storage, and other devices) that applied if the probation officer has reasonable suspicion that evidence of a violation of the conditions of the defendant's supervised release may be found.

(VOSR Mem. at 2, 4; Def. Supp. Mot. Ex. E, Ex. F.)

On or about November 30, 2021, the Probation Office conducted a search of the Residence pursuant to the defendant's search condition. The results of the probation search are not in dispute.[2] (*See* Def. Supp. Mot. Ex. D ¶ 10, Ex. G (Excerpts from Probation Office supervision records regarding probation search); VOSR Mem. at 4-5.) During the search, the probation officers on scene seized, among other things, an orange prescription bottle containing a white powder substance, two standard business-sized envelopes, a Dell laptop, and a Sandisk-brand USB drive. (Def. Supp. Mot. Ex. D ¶ 10.) Additionally, during the search, the defendant admitted to the probation officers that he had used his mother's unmonitored laptop in contravention of his supervised release conditions. (*Id.* ¶¶ 10, 13; VOSR Mem. at 5.) The Probation Office had previously instructed the defendant not to use his mother's internet-capable devices, including the laptop. (VSOR Mem. at 5.) The defendant's mother, who later returned to the Residence during the search, also corroborated that she had allowed her son to use her

---

[2]     Although the defendant submitted an affidavit denying that he made any statements about the contents of the USB drive seized during the probation search, that dispute has no bearing on the propriety of the probation search or the FBI's subsequent search warrants, which did not reference or rely on this statement.

computer. (*Id.*) The probation officers also asked the defendant's mother to provide the password to the laptop to assess whether the defendant had used it and to view the contents of the USB drive. (Def. Supp. Mot. Ex. G.)

**F.    The FBI Search Warrants for the Residence and Devices**

The FBI subsequently sought and obtained three search warrants as part of its investigation.

**1.    December 3, 2021 Premises Warrant**

On December 3, 2021, the FBI obtained a search warrant for the Residence (the "Premises Warrant"). (Def. Supp. Mot. Ex. B (December 3, 2021 Premises Warrant Affidavit).) With respect to probable cause, the affidavit set forth a summary of the facts consistent with those set forth above, including the results of the November 30, 2021 probation search. (*Id.* ¶¶ 7-12.) The affidavit specified there was a quantity of white powder recovered during the probation search along with a laptop computer and USB drive. (*Id.* ¶ 12.) The affidavit further stated that the defendant told a member of the Probation Office that he personally used the laptop without telling the Probation Office and without the required monitoring software. (*Id.*) The affidavit also explained that the Probation Office identified, but did not seize, an electric typewriter and printing ink cartridges for a printer. (*Id.*) The defendant had also told the Probation Office that a printer had been connected to the laptop but had been thrown away approximately six months earlier. (*Id.*) The affiant, Special Agent Knudsen, also stated based on his training, experience, and participation in the investigation that the defendant likely used devices, including either the laptop, typewriter, or both, to create the envelope and letter sent to Victim-1 based on their typewritten or printed lettering. (*Id.* ¶¶ 13-16.) The affidavit further stated that the defendant may have hidden other devices in the Residence because such undisclosed devices would be in violation of his supervised release conditions, and the defendant had already admitted to using

14

electronic devices in a manner that violated his terms of supervision. (*Id.* ¶ 17.) The December 3, 2021 affidavit for the Premises Warrant set forth probable cause that the defendant had engaged in violations of 18 U.S.C. §§ 875(c) (interstate threats), 876(c) (mailing a threatening communication), and 1038(a) (false information and hoaxes), and that evidence of such violations would be found in the Residence. (*Id.* ¶ 6.)

Magistrate Judge Debra Freeman authorized the Premises Warrant on December 3, 2021.

### 2.    December 3, 2021 Laptop and USB Warrant

The same day, the FBI also obtained a search warrant for the laptop and USB drive seized during the November 30, 2021 probation search of the Residence (the "Laptop and USB Warrant"). (Def. Supp. Mot. Ex. C (December 3, 2021 Laptop and USB Warrant Affidavit).) The affidavit established probable cause through a summary of the facts largely identical to that set forth in the Premises Warrant. (*Id.* ¶¶ 5-10.) The affidavit further stated that the USB drive, described as "an electronic storage device of the sort commonly used in connection with laptops such as [the subject laptop], was found in proximity to [the subject laptop]." (*Id.* ¶ 10.) In addition to the probable cause described above regarding the defendant's use of the laptop (including in violation of the terms of his supervised release), the affidavit also stated that the USB drive, based on affiant Special Agent Knudsen's training and experience, can be used in conjunction with the laptop and was likely to have additional stored information that could constitute evidence of the powder letter, including "saved research or information regarding [Victim-1], writings similar to that of the [l]etter, and information regarding powder-based attacks, threats, and hoaxes." (*Id.* ¶ 12.) The December 3, 2021 affidavit for the Laptop and USB Warrant set forth probable cause that the defendant had engaged in violations of 18 U.S.C. §§ 875(c) (interstate threats), 876(c) (mailing a threatening communication), and 1038(a) (false

information and hoaxes), and that evidence of such violations would be found on the laptop and USB drive. (*Id.* ¶ 3.)

Judge Freeman authorized the Premises Warrant on December 3, 2021.

### 3.    December 17, 2021 Devices Warrant

Finally, on December 17, 2021, the FBI obtained a search warrant for 13 electronic devices, including the laptop, USB drive, and multiple other electronic devices found in the Residence during the execution of the Premises Warrant (the "Devices Warrant"). (Def. Supp. Mot. Ex. D.)[3] The affidavit established probable cause through a summary of the facts largely identical to that set forth in the Premises Warrant and the Laptop and USB Warrant. (*Id.* ¶¶ 5-10.) The affidavit further stated that during the execution of the Premises Warrant, the FBI identified and seized, among other things, "a typewriter, printer cartridges, various powders, two pieces of paper with written instructions for deleting digital files," and 11 electronic devices that included an iPad Mini, two additional USB drives, a Sky Devices tablet, two digital cameras, and five different cellphones. (*Id.* ¶¶ 4, 11.) The affidavit also stated that, during the execution of the Laptop and USB Warrant, the FBI identified multiple files containing CSAM on the USB drive, including a video depicting a "partially naked, prepubescent female in a bathroom, exposing her anus and vagina," and "various prepubescent females who have had penises inserted inside their mouths." (*Id.* ¶ 12.) The affidavit stated, as with the previous affidavits, that the defendant had admitted to using electronic devices in a manner that violated his terms of supervised release. (*Id.* ¶ 13.) In light of the discovery of CSAM on the defendant's devices as referenced above, the

---

[3]    The defendant does not appear to seek suppression of the evidence recovered pursuant to the Devices Warrant. The defendant incorrectly states that the Government "has not disclosed any evidence obtained from the digital devices." (Def. Supp. Mot. at 41.) The Government produced extractions of these devices on June 1, 2022 as part of its Rule 16 discovery disclosures (Exhibit B (Discovery Letter)), a fact that the Government confirmed to counsel on March 22, 2023 (Exhibit C (Email to Defense Counsel)).

affidavit further sought to expand the subject offenses in the Laptop and USB Warrant to authorize the search to include evidence of violations of 18 U.S.C. §§ 2252 and 2252A. The December 17, 2021 affidavit for the Devices Warrant set forth probable cause that the defendant had engaged in violations of 18 U.S.C. §§ 875(c) (interstate threats), 876(c) (mailing a threatening communication), 1038(a) (false information and hoaxes), 2252 (receipt, distribution, and possession of material involving the sexual exploitation of minors), and 2252A (receipt, distribution, and possession of child pornography), and that evidence of such violations would be found on the 13 subject electronic devices. (*Id.* ¶ 3.)

Magistrate Judge Gabriel W. Gorenstein authorized the Devices Warrant on December 17, 2021.

After executing the Devices Warrant, the FBI identified multiple saved searches on the iPad Mini beginning on or about November 30, 2021 (after the probation search) that included, among other things, "sandisk usb is it traceable?" and "what happens when you violate probation." (*See* USAO_001192-93.)

### G.    Procedural History

On or about January 3, 2022, the Probation Office requested a warrant for the defendant's arrest based on a petition alleging four violations of the defendant's supervised release conditions. Judge Woods issued the requested warrant, and the defendant was arrested and detained on or about January 6, 2022. On or about October 27, 2022, a grand jury in this District returned a two-count Indictment charging the defendant with false information and hoaxes, in violation of 18 U.S.C. §§ 1038(a)(1) and 2 (Count One), and possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2. The VOSR proceedings were subsequently consolidated before this Court.

### H.    The Defendant's Jail Call Admissions

Following the defendant's arrest and remand on the VOSR, the Government obtained recordings of the defendant's jail calls, which were produced along with translated draft summaries in discovery (the calls were conducted principally in Spanish). During those calls, based on the draft translations, the defendant made multiple admissions to his mother regarding his involvement in the offense conduct, including:

- On or about January 11, 2022, the defendant said that no one should ever say this was his mother's fault because the defendant did everything behind her back and he felt bad that she found out this way.

- On or about January 21, 2022, the defendant told his mother that he knows it is his fault he is in jail, and that he messed up.

- On or about February 3, 2022, the defendant told his mother that this was the biggest screw up he has done in his life, and that he is so sorry.

- On or about February 4, 2022, the defendant told his mother, "the mistake was mine, because you did not know anything about that, so you don't have to feel bad. I do, because I am the one who did that stupid thing. . ."

## III.    ARGUMENT

The defendant baldly and wrongly asserts that, as a matter of law, the defendant's letter to Victim-1 somehow cannot have constituted a criminal act. And, his meritless argument goes, because the defendant could not have committed a crime, the investigative steps taken by the Probation Office and the FBI were improper, and the resulting Indictment should be dismissed. As explained below, the Indictment properly alleges a violation of the false information and hoaxes statute, and the defendant's contention that the Government cannot establish that the powder letter constituted a threat under the statute is an issue for the jury. From there, the defendant's suppression arguments are easily dispensed: the Probation Office's search was overwhelmingly supported by reasonable suspicion; and the FBI's warrants were supported by probable cause, sufficiently particularized, not overbroad, and executed in good faith. Finally, the

charges related to the hoax powder letter and possession of CSAM are properly joined under the Federal Rules of Criminal Procedure, and severance is not appropriate.

### A. The Indictment Properly Alleges that the Defendant Violated 18 U.S.C. § 1038(a)

#### 1. Applicable Law

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed R. Crim. P. 7(c)(1). An indictment is sufficient if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *United States v. Hamling*, 418 U.S. 87, 117 (1974)). Accordingly, an indictment need "do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id.*

As relevant here, 18 U.S.C. § 1038(a)(1) provides criminal penalties for "[w]hoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of [Chapters 10 and 113B of Title 18, United States Code, which include, among other offenses, offenses relating to terrorism and the use of biological and chemical weapons such as anthrax]."

#### 2. Discussion

The defendant concedes that the "indictment clearly alleges the elements of the crime of false information and hoaxes" in Count One. (Def. Supp. Mot. at 42.) No more under Rule 7 is required and that defeats the motion; as the ensuing discussion makes clear, the defendant's challenges to this count are at bottom matters for the jury. The defendant claims he could not

have violated Section 1038(a) because his letter to Victim-1 "did not contain false information about the use of a chemical or biological weapon." (*Id.* at 43.) The defendant argues that because the end of the letter references "snow/sugar for [Victim-1's] nose," the letter "explicitly identifi[ed]" that the sender (*i.e.*, the defendant) intended for the powder to be construed as cocaine. (*Id.* at 20.) In other words, the defendant claims, by referencing "snow/sugar," he "clearly specified that the white powder should *not* be interpreted as a chemical weapon," and therefore no violation of Section 1038(a) occurred. (*Id.* at 21.)

First, and dispositive, any argument that the language of the letter shows the defendant did not have the requisite intent to violate the statute is squarely a matter for the jury. And any dispute about how the jury should be instructed on the statute's intent requirement can be resolved by the Court pre-trial when the parties submit requests to charge.

While the Court need go no further at this stage, the Government notes that the defendant's argument appears to reflect a misunderstanding of what the statute actually requires. Indeed, multiple courts have rejected this sort of intent argument as contrary to the plain language of the statute.

As the statute makes clear, the Government is required to show (1) that the defendant "engage[d] in any conduct with intent to convey false or misleading information"; and (2) that he did so "under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation" of an enumerated statute. 18 U.S.C. § 1038(a). Consistent with that express language, "to convict under § 1038(a)(1), the government need *not* prove that [the defendant] 'intended' that his victims could 'reasonably believe' his false information or that they could 'reasonably believe' that terrorist activity had taken, was taking, or would take place." *United*

*States v. Castagana*, 604 F.3d 1160, 1166 (9th Cir. 2010) (emphasis added). The Ninth Circuit squarely rejected the argument that Section 1038(a) requires the Government to prove that the defendant "specifically intended the recipients of his letters reasonably to believe that they contained anthrax." *Id.* at 1161, 1163 ("Whether the circumstances were such that [the defendant's] victims or other observers may reasonably have believed his statements to indicate terrorist activity is a question wholly independent of [the defendant's] intentions.").[4] The Ninth Circuit further explained that "it makes little sense to say that a perpetrator can *intend* that anything be 'reasonably believed.'" *Id.* at 1163-64 (explaining "the insertion of this reasonableness requirement removes from consideration the subjectivity of the actor's intent and replaces it with an objective standard").

Similarly, in *United States v. Santiago*, Judge Griesa denied a motion to dismiss Section 1038(a) charges when the defendant sent a white powder substance to the IRS along with an annotated notice of unpaid taxes that was laden with profanity but did not directly reference the powder. 2016 WL 750297, at *1 (S.D.N.Y. Feb. 22, 2016) (explaining the note stated "I do not live at this address any more so go fuck yourself [catch] me when you can I just [finished] getting a new [law] suit so if you can [catch] me get my money do so [any] way [you] can OK"; "suck my dick!"; and included a picture of male genitals). Judge Griesa explained that "the statute focuses on a defendant's *conduct*." *United States v. Santiago*, 2016 WL 954819, at *2 (S.D.N.Y. Mar. 11, 2016) (denying motion for reconsideration). As such, "a jury could conclude that defendant's conduct—placing a white powdery substance into an envelope with a note

---

[4]    In *Castagana*, the defendant sent multiple hostile letters to celebrities containing inert white powder. *Id.* at 1161 ("Do you remember what happened to that loudmouth Alan Berg back in the 1980s? You should Mr. Jon Stewart—New York City is so full of demagogues, I hope your kind live to see your city destroyed in your lifetime!"); *id.* ("Keith Olbermann, There are too many demagogues in America. All of you are poisoning the well! Time to give your kind—a taste of your own medicine . . .").

containing the hostile messages—intended to convey the false information that the envelope contained a dangerous chemical substance." *Id.* And similarly, "a jury could also conclude that it was reasonable for the IRS employee who opened the envelope to see the white powdery substance, read the notice, and believe that an attack was taking place." *Id.*

In *United States v. Stallings*, the Fifth Circuit affirmed a Section 1038(a) conviction against a defendant who left bags at a bank branch, prompting a bomb squad response. 2023 WL 3534445, at *2-6 (5th Cir. May 18, 2023). As relevant here, the Fifth Circuit explained the defendant's rejected jury instruction—that the jury must find he "intended that the information he communicated—namely, the occurrence of a violation of 18 U.S.C. § 844(i)—be reasonably believable"—was "an incorrect statement of the law" that "imports the mens rea requirement from the first part of the statute—'intent to convey false or misleading information'—to the second part of the statute—'where such information may reasonably be believed.'" *Id.* at *6; *see also United States v. Murray*, 667 F. App'x 436, 437 (5th Cir. 2016) (rejecting, on plain error review, argument that Section 1038(a) "requires the Government to prove that the recipient of a terroristic threat contemporaneously believed it").

Against that backdrop, the defendant's claim that he can insulate himself from Section 1038(a) by writing "snow/sugar for your nose" at the end of a threatening letter describing Victim-1, his family, and his children getting a "slow, painful and terminal disease" is meritless. *See Castagana*, 604 F.3d at 1164 ("Even if a perpetrator does not intend that his false information be believed as indicative of terrorist activity, the false information will nevertheless drain substantial resources and cause mental anguish when it is objectively credible."); *see also United States v. Naylor*, 2013 WL 1867064, at *1-2 (D. Neb. May 3, 2013) (denying motion to dismiss Section 876(c) indictment when white powder accompanying hostile letter was

22

specifically described as cornstarch because it "was self-evidently a threat" and "properly alleged the essential elements of § 876(c)".

Further, to the extent the defendant's argument rests on the related contention that his letter "did not violate [the] statute, since it did not contain false information about the use of a chemical or biological weapon" (Def. Supp. Mot. at 43), that again entirely misses the mark, as the statute does not require a determination of whether any particular information was in fact false, but rather whether the defendant intended to convey false or misleading information. Indeed, the defendant effectively concedes that he intended to convey false and misleading information by mailing a powder substance to Victim-1. (*Id.* at 1, 15, 20-21.) In any event, whether the defendant acted with the requisite intent is, again, a question for a properly instructed jury. Finally, with respect to the second prong of the analysis, the objective reasonableness component, to the extent the defendant argues the content of his letter somehow shows the information conveyed therein could not reasonably have been believed and/or did not indicate that an enumerated offense had occurred or was occurring, that is unquestionably a matter for the jury to decide.

Accordingly, the Court should deny the defendant's motion to dismiss Count One of the Indictment. To the extent the defendant seeks dismissal of Count Two due to suppression of evidence, that argument fails for the reasons explained below.

### B.   The Probation Search Was Reasonable

#### 1.   Applicable Law

##### a.   Special Needs Exception and Supervised Release Search Conditions

"Because the ultimate touchstone of the Fourth Amendment is reasonableness, its warrant requirement is subject to certain reasonable exceptions." *United States v. Iverson*, 897 F.3d 450,

458 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)). One of those is commonly referred to as the "special needs" exception, which "recognizes as constitutionally reasonable limited searches or temporary seizures that serve special needs beyond the normal need for law enforcement, where the warrant and probable-cause requirement are impracticable." *Berg v. Kelly*, 897 F.3d 99, 106 (2d Cir. 2018) (alterations and internal quotation marks omitted) (quoting *Skinner v. Railway Labor Execs. Ass'n*, 489 U.S. 602, 619 (1989)). "After a court determines whether the search or seizure served a special need distinct from the ordinary evidence gathering associated with crime investigation, it must evaluate whether the search or seizure was reasonable in light of competing governmental and individual considerations." *Berg*, 897 F.3d at 106 (internal quotation marks omitted).

The Second Circuit has explained that one of a probation officer's primary "supervision responsibilities is to ensure that a convicted person under supervision does not again commit a crime. We have long recognized a duty on the part of the parole officer to investigate whether a parolee is violating the conditions of his parole . . . ." *United States v. Reyes*, 283 F.3d 446, 459 (2d Cir. 2002). In fact, "[a] probation officer is responsible for ensuring that a convicted person serving a term of federal supervised release is not violating the conditions of his supervised release, which includes verifying whether the supervisee is . . . committing other crimes." *Id.* at 463. In this way, "the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined." *Id.*

It is long established that searches of probationers, parolees, and persons subject to supervised release—often referred to as "probation searches"—"fall[ ] within the 'special needs' exception to the warrant requirement. Indeed, [such persons] can be subjected to burdens upon their privacy that would be unconstitutional were they applied to the general citizenry, as long as

those burdens are imposed pursuant to a regulation that satisfies the Fourth Amendment's reasonableness requirement." *Frego v. Kelsick*, 690 F. App'x 706, 708 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Moore v. Vega*, 371 F.3d 110, 115 (2d Cir. 2004)); *United States v. Braggs*, 5 F.4th 183, 184 (2d Cir. 2021) ("Under the Special Needs Doctrine, a parole officer may search a parolee so long as the search is reasonably related to the performance of the officer's duties."). This is because "whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (internal quotation marks omitted).

It is also well settled that individuals "on supervised release," such as the defendant, have "a diminished expectation of privacy that is inherent in the very term '*supervised release*.'" *United States v. Balon*, 384 F.3d 38, 44 (2d Cir. 2004) (quoting *Reyes*, 283 F.3d at 460 (emphasis in original)). This is because "supervised release 'is meted out in addition to, not in lieu of, incarceration.'" *Id.* (quoting *Reyes*, 283 F.3d at 461). Regarding the privacy intrusion, probationers, parolees, and persons subject to supervised release "have severely diminished expectations of privacy by virtue of their status alone." *Samson*, 547 U.S. at 852; *accord United States v. Lambus*, 897 F.3d 368, 402-03 (2d Cir. 2018); *see also United States v. Goldenberg*, 2006 WL 266564, at *5 (S.D.N.Y. Feb. 3, 2006) ("[A] search by probation officers that is unreasonable with respect to an individual not serving a term of supervised release may be reasonable with respect to an individual who is.").

Such expectations are "further diminished where [such persons have] consented to a search condition." *United States v. Jackson*, 663 F. App'x 31, 33 (2d Cir. 2016) (collecting cases); *accord United States v. Elder*, 2018 WL 833132, at *3 (W.D.N.Y. Feb. 13, 2018) ("This

limited expectation of privacy is even further reduced where . . . a defendant's term of supervised release includes . . . a condition permitting the Probation Officer to search the defendant's home for contraband."). Concerning governmental interests, "probation searches . . . are necessary to the promotion of legitimate governmental interests," including the government's "dual interest in integrating probationers back into the community and combating recidivism. . . . [P]robationer[s] are more likely than the ordinary citizen to violate the law." *Samson*, 547 U.S. at 849 (internal quotation marks omitted); *accord United States v. Knights*, 534 U.S. 112, 120-21 (2001) ("The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. . . . [The State's] interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.").

This rationale applies with equal if not more force to persons on supervised release, as opposed to probationers or parolees. "Supervised release, parole, and probation lie on a continuum. The most severe is supervised release, which is meted out in addition to, not in lieu of, incarceration; supervised release is followed, in descending order, by parole, then probation." *United States v. Lifshitz*, 369 F.3d 173, 181 n.4 (2d Cir. 2004) (internal quotation marks omitted); *accord United States v. Reyes*, 283 F.3d at 461; *United States v. Jackson*, 866 F.3d 982, 985 (8th Cir. 2017) ("[S]upervised release . . . involves the most circumscribed expectation of privacy.").

"In light of these considerations, the Supreme Court has held that when an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the

probationer's significantly diminished privacy interests is reasonable." *Jackson*, 663 F. App'x at 33 (internal quotation marks omitted) (quoting *Knights*, 534 U.S. at 121); *United States v. Washington*, 2012 WL 5438909, at *5 (S.D.N.Y. Nov. 7, 2012) (explaining that "courts need ask only whether 'the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty[]'" (quoting *United States v. Newton*, 369 F.3d 659, 665–66 (2d Cir. 2004))).[5]

### b.    Reasonable Suspicion

Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability," and "takes into account the totality of the circumstances—the whole picture." *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal quotation marks omitted); *see also Jackson*, 663 F. App'x at 33 (noting that "[i]n evaluating whether an officer had reasonable suspicion to justify a search, courts look to the 'totality of the circumstances'" (citation omitted)). "With respect to ascertaining whether an officer has reasonable suspicion, 'the proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing.'" *Vasquez v. Maloney*, 2020 WL 1309989, at *9 (S.D.N.Y. Mar. 19, 2020) (quoting *United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990)).

---

[5]    In *Bragg*, the Second Circuit explained that the district court erred in holding that reasonable suspicion was required for a parole search that was "reasonably related to the performance of the [parole officers'] duties" after receiving an anonymous tip suggesting that the parolee had guns in violation of his parole conditions. 5 F.4th at 188. "Because a search undertaken by a parole officer of a parolee to detect parole violations is 'reasonably related to the parole officer's duties,' such a search is 'permissible' under the Special Needs framework and accordingly 'comport[s] with the Fourth Amendment.'" *Id.* (internal citations omitted). In any event, even if not required, the probation search of the defendant's residence here was easily supported by reasonable suspicion.

"The inquiry is an objective one" where "subjective intentions or motives" of the officers on the scene are "irrelevant." *Id.*; *see also Knights*, 534 U.S. at 122 (explaining that the reasonable suspicion analysis "rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search," and so "there is no basis for examining official purpose"); *Jackson*, 663 F. App'x at 33-34 (noting that, "[i]n evaluating whether an officer had reasonable suspicion to justify a search," courts look to whether the officer had an "objective" basis); *United States v. Davis*, 111 F. Supp. 3d 323, 337 (E.D.N.Y. 2015) ("Reasonable suspicion, like probable cause, is determined objectively based on the information available to the police officers at the time . . . and not on their subjective state of mind.").

"Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (citations and internal quotation marks omitted); *see also United States v. Diaz*, 802 F.3d 234, 239 (2d Cir. 2015) (noting that reasonable suspicion requires "some minimal level of objective justification" (internal quotation marks omitted)); *United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002) ("Reasonable suspicion is not a high threshold . . . ."); *Washington*, 2012 WL 5438909, at *10 (describing reasonable suspicion as "an undeniably low threshold").

### 2.    Discussion

The probation search of the defendant's Residence was overwhelmingly supported by reasonable suspicion. Because the defendant was subject to a supervised release condition allowing for warrantless searches, and because the officers had reasonable suspicion that their search would find evidence of violations of his conditions of supervised release, including the condition that the defendant not commit another crime, the search was reasonable under the

Fourth Amendment. Thus, the defendant's motion should be denied, without any need for a hearing as the relevant facts are undisputed.

The "undeniably low threshold" of reasonable suspicion for the search was easily met here. *See Washington*, 2012 WL 5438909, at *10. In addition to the fact of the defendant's search condition, as part of his release conditions, the defendant could not commit another federal, state, or local crime. And, as explained above, at the time of the search, the Probation Office had learned that: (i) an FBI agent in the sex crimes unit at the New York Field Office received a letter on or about November 15, 2021 containing threatening language and a white powder substance; (ii) the Stamp used to send the letter was purchased using a credit card belonging to the defendant's mother, who lived with the defendant at the Residence; (iii) the FBI had interviewed the defendant at his Residence regarding the letter and, in Special Agent Knudsen's assessment, the defendant's explanation did not make sense; and (iv) the defendant had previously made threats against the U.S. Government, including blowing up Federal Plaza, the headquarters of the New York Field Office of the FBI. Taken together, on these facts alone, there was ample reasonable suspicion to conduct the probation search including because there was clearly reasonable suspicion that the defendant had violated his conditions of supervised release (*i.e.*, not to commit another federal, state, or local crime).

The defendant does not dispute these facts (nor could he), but rather declares the search was illegal because the letter to Victim-1 was "not criminal" and therefore reasonable suspicion could not exist. (Def. Supp. Mot. at 22.) As explained above, *supra* Section III.A, this argument is meritless. It is also beside the point—the ultimate determination of whether the defendant committed a crime is an entirely different threshold than whether the Probation Office had reasonable suspicion for the probation search, which it clearly did. Moreover, it is nonsensical to

claim that the probation search was "not 'reasonably related' to any of [Officer] Bressor's duties as a probation officer." (*Id.*) Officer Bressor had a "professional duty as a probation officer to act on the information he had received from the FBI," particularly when confronted with information about his supervisee potentially sending a threatening powder letter to the FBI, especially knowing his history of prior threatening statements against the U.S. Government. *Washington*, 2012 WL 5438909, at *9-10. Based on Officer Bressor's duties as a probation officer, his decision to conduct a search of the Residence based on the information provided by the FBI was eminently "rational and reasonable." *Id.*

In sum, the defendant was subject to a search condition and the Probation Office easily had reasonable suspicion that the search would reveal evidence of violations of the defendant's conditions of supervised release. Accordingly, the probation search was reasonable.

### C. The Warrants Were Supported by Probable Cause

#### 1. Applicable Law

##### a. Probable Cause

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The legal standard for determining whether a particular warrant application is supported by probable cause is well established. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Such determinations must be approached in a practical way, *id.* at 232, because "probable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983). Additionally, the training and experience of law enforcement agents bear significantly on

probable cause determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience can all support a probable cause finding. *Id.* at 231-32.

A warrant issued by a neutral and detached magistrate is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993). This is so for at least two reasons. First, as the Supreme Court has observed, "[r]easonable minds frequently may differ on the question whether a particular affidavit established probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984). Second, "[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). For these reasons, the Supreme Court has directed that "courts should not invalidate [a] warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *Id.* at 109.

### b.    Good Faith Exception

Under the so-called "good faith" exception, the exclusionary rule and its remedy of suppression does not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. In announcing this principle, the Supreme Court noted that suppression could have no deterrent effect on law enforcement that acted on the objectively reasonable assumption that their conduct did not violate the Fourth Amendment. *Id.* at 918-19. In analyzing the applicability of the good faith exception, the pivotal question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23. If the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression is not warranted. *See, e.g.*, *United States v. Singh*, 390 F.3d 168, 183 (2d Cir. 2004). Moreover, "[t]o trigger the

exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

As a result, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922; *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause").

### 2. Discussion

The three FBI search warrants were well supported by probable cause. As with the probation search, the defendant does not dispute any material facts in the affidavits for the Premises Warrant, the Laptop and USB Warrant, and the Devices Warrant. Nor can he. The affidavits contain photographs of the letter and envelope sent to Victim-1, with the entirety of the threatening letter quoted for the reviewing magistrate judge. (Def. Supp. Mot. Ex. B ¶ 7.) The defendant does not and cannot claim that Special Agent Knudsen was incorrect in explaining how the FBI identified the defendant as living at the Residence as part of its investigation, or the results of the November 30, 2021 probation search described and photographed in the affidavits. (*Id.* ¶¶ 8-12.)

Instead, the defendant's probable cause argument turns on two assertions that the Court can and should easily reject. First, the defendant rehashes the claim that he did not commit a crime by sending the admittedly "abhorrent" letter to Victim-1, which, the argument goes, means the warrants could not have shown probable cause even to investigate his conduct. (Def. Supp.

Mot. at 28-29.) For the reasons explained above, *supra* Section III.A, that argument is meritless. But regardless, the defendant's insistence that he did not commit a crime fails to grapple with the probable cause standard, and is immaterial to whether the warrants were valid. Moreover, the defendant has provided no basis to question the reviewing magistrate judge's probable cause determination beyond his say-so. This conclusory challenge is wholly without merit.

Second, the defendant baldly, without any support, asserts that the Premises Warrant "did not establish probable cause to believe that further evidence related to the [Victim-1] letter would be found in [the Residence]." (Def. Supp. Mot. at 29.) This similarly conclusory contention is squarely contradicted by Special Agent Knudsen's affidavit, which clearly stated that relevant evidence was likely still inside the Residence. This included the electric typewriter and printer cartridges that the Probation Office did not seize during the prior probation search. (Def. Supp. Mot. Ex. B ¶ 12.) The affidavit also cited the defendant's own statements to the Probation Office that he had used a laptop in violation of his release conditions and previously had a printer connected to the laptop. (*Id.* ¶¶ 12-14.) It was eminently reasonable for Special Agent Knudsen to conclude, based on his training, experience, and participation in the investigation, that the typewriter and printer cartridges that likely remained in the Residence may constitute relevant evidence. (*Id.*) On that same basis, Special Agent Knudsen reasonably concluded that the defendant may have hidden other devices in the Residence in light of, in part, his admission to using such devices in violation of his release conditions. (*Id.* ¶ 17.) As such, the Premises Warrant clearly established probable cause to search the Residence.

The defendant's arguments concerning the Laptop and USB Warrant and the Devices Warrant fail for similar reasons. For starters, the defendant concedes that the "letter and envelope were clearly produced by a computer." (Def. Supp. Mot. at 31.) It is therefore puzzling, and

meritless, for the defendant to suggest it was somehow improper for Special Agent Knudsen to conclude, based on his training and experience, that individuals who engage in threatening behavior such as sending hoax letters often use electronic devices in furtherance of their criminal activity, and that it was likely the defendant used an electronic device to create the envelope and the letter or otherwise plan and carry out the offense. (*See* Def. Supp. Mot. Ex. C ¶ 12.) Special Agent Knudsen also provided ample information to support his conclusion that the USB drive would likely contain relevant evidence as a storage device that can be used with the laptop. (*Id.*)[6]

Accordingly, the FBI warrants were each well supported by probable cause, nor, in the alternative, can the defendant overcome the presumption of good-faith reliance on the search warrants. *See, e.g.*, *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011). The defendant's conclusory claim that "no FBI agent could have relied on the warrants in good faith" because the defendant could not have committed the crimes under investigation (Def. Supp. Mot. at 40) is without merit for the reasons explained above, *supra* Section III.A. The defendant's claims fall well short of in any way calling into question the probable cause underlying the warrants.

### D.    The Warrants Were Sufficiently Particularized and Not Overbroad

#### 1.    Applicable Law

##### a.    Particularity

To satisfy the particularity requirement, a warrant must: (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to designated crimes." *United States v.*

---

[6]    There is no apparent basis for the defendant's claim that Special Agent Knudsen's statement that the USB drive "can be used in conjunction" with the laptop is somehow "hypothetical and speculative." (Def. Supp. Mot. at 36.) In any event, USB (which stands for "Universal Serial Bus") is a ubiquitous peripheral connector that is commonplace on most modern computers.

*Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal quotation marks omitted). "The Fourth Amendment does not require a perfect description of the data to be searched and seized, however," and "[s]earch warrants covering digital data may contain 'some ambiguity. . . .'" *Id.* (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)). "A search warrant does not necessarily lack particularity simply because it is broad." *Id.* at 100. Rather, the requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items authorized to be searched and seized. *See Groh v. Ramirez*, 540 U.S. 551, 557-59 (2004); *United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010).

A warrant that calls for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it offers a list of illustrative items. *See United States v. Riley*, 906 F.2d 841, 843-45 (2d Cir. 1990) (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well, seizure of "other items that constitute evidence of the offenses" identified); *United States v. Young*, 745 F.2d 733, 759-60 (2d Cir. 1984) (warrant allowing seizure of listed items plus "other evidence of" the crimes specified was sufficiently particular); *United States v. Lustyik*, 57 F. Supp. 3d 213, 227-28 (S.D.N.Y. 2014) (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by phrase "including but not limited to"); *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").

### b.    Overbreadth

"[A warrant] is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446. In order to "determine whether a warrant is overbroad, courts look to whether there exists probable cause to support the breadth of the search

that was authorized." *United States v. Ray*, 541 F. Supp. 3d 355, 398 (S.D.N.Y. 2021) (internal quotation marks omitted). Additionally, though "a lack of particularity can result in a warrant's overbreadth, a broad warrant does not necessarily lack particularity." *Id.* As noted above, the Second Circuit has also recognized that "[s]earch warrants covering digital data may contain some ambiguity . . . so long as law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." *Ulbricht*, 858 F. 3d at 99 (internal quotation marks omitted).

2.      **Discussion**

The defendant claims the warrants here "authorized law enforcement to seize broad, generalized categories of information," and amounted to the "very definition of a general warrant." (Def. Supp. Mot. at 34.) Not so. Each of the three warrants obtained by the FBI limited the items to be seized to evidence of certain enumerated subject offenses and listed the items to be seized by their relation to the specified subject offenses. The defendant fails to acknowledge this in his brief, including when quoting portions of the warrants at issue. For instance, the defendant claims that the Premises Warrant authorized the Government to "search through all of Mr. Landa's 'notes, documents, records . . . in any format and medium,' that in any way related to law enforcement agencies." (Def. Supp. Mot. at 31.) However, he omits that such description is specifically limited to the subject offenses specified in the warrant, including their commission and motivation. (*Id.* Ex. B at 25-26.)

In any event, even if the language of the warrants had been so broad, the Second Circuit has deemed exactly that sort of language proper where, as here, the search is expressly limited to evidence of certain subject offenses. *See, e.g.*, *United States v. Washington*, 48 F.3d 73, 77-78 (2d Cir. 1995) (rejecting challenge to warrant that authorized, *inter alia*, seizure of "[a]ny and all

papers, records, receipts, documentation, telephone lists and records which may be related to illicit drug activities"); *Riley*, 906 F.2d at 844-45. The defendant contends that the warrant "granted law enforcement the unbridled discretion to conduct a broad, exploratory search for anything it considered of evidentiary value." (Def. Supp. Mot. at 34 (citing *United States v. Wey*, 256 F. Supp. 3d 355, 385 (S.D.N.Y. 2017)). But in *Wey*, unlike here, the warrant lacked particularity because the list of items to be seized was not expressly limited to specific enumerated crimes. *See Wey*, 256 F. Supp. 2d at 386 ("By the Warrants' terms . . . no connection to any suspected crime . . . is necessary to render the expansive list of items . . . seizable."). Furthermore, the defendant's arguments about a lack of temporal limitation in the warrants are unavailing particularly when the subject offenses in the Premises Warrant and Laptop and USB Warrant focused on discrete conduct that happened only weeks earlier. *See United States v. Levy*, 2013 WL 664712, at *10-11 (S.D.N.Y. Feb. 25, 2013) (rejecting challenge to warrant that did not include temporal limitation, where "no controlling authority requires a specific time frame").

Indeed, the execution of the warrants further undermines the defendant's unsupported proclamations of impropriety. As explained in the Devices Warrant, the seizure of evidence pursuant to the Premises Warrant was focused on the typewriter, printer cartridges, various powders, pieces of paper "with written instructions for deleting digital files," and 11 electronic devices. (Def. Supp. Mot. Ex. D ¶ 11; *see also id.* at 11.) The defendant does not (and could not) claim that any of these items was unresponsive to the warrants, or was improperly seized.[7]

---

[7]    Although the defendant claims in passing that the Government seized "privileged communications" with his prior attorney (Def. Supp. Mot. at 34), he does not, and cannot, claim any impropriety occurred. Addressed correspondence was seizeable evidence of occupancy for the Residence, and the referenced attorney communications were not reviewed by the prosecution team and were produced to defense counsel in discovery through a filter review.

Additionally, to the extent the defendant suggests the Probation Office improperly searched the USB drive (Def. Supp. Mot. at 39), that is irrelevant, as neither the Laptop and USB Warrant

In summary, the warrants here in no way resemble "general warrants," or cases where warrants failed to limit items to be seized to evidence of enumerated offenses. The warrants were each particularized and not overbroad. The Court should reject the defendant's suppression motion.

### E.    The Charges in the Indictment Should Be Tried Together

#### 1.    Applicable Law

Rule 8(a) of the Federal Rules of Criminal Procedure sets forth "a liberal standard for joinder." *United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977). The rule permits joinder of separate criminal offenses where the offenses are (1) "of the same or similar character," (2) "based on the same act or transaction," or (3) "connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "Each of these tests for when offenses may be tried together reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused." *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).

"'Similar' charges include those that are somewhat alike, or those having a general likeness to each other." *United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) (internal quotation marks omitted). As the Second Circuit explained in *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980), "requiring too precise an identity between the character of the offenses 'would fail to give effect to the word 'similar' succeeding the word 'same' and thus violate an elementary rule of statutory construction.'" (quoting *Edwards v. Squier*, 178 F.2d 758, 759 (9th Cir. 1949)).

---

(which did not reference CSAM), nor the Devices Warrant (which described the FBI's discovery of CSAM on the USB drive pursuant to the Laptop and USB Warrant and sought to expand that prior warrant), referenced or relied on any such search.

Multiple distinct counts "warrant joinder in a single trial" when they have a "sufficient logical connection" to one another, *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990), or where "the same evidence may be used to prove each count," *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991). Joinder of counts is also appropriate where the evidence proving the counts is "interconnected and overlapping." *United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994). "[C]ounts might be 'connected' if one of the offenses 'depends upon or necessarily leads to the commission of the other,' or if proof of one act 'constitutes or depends upon proof of the other.'" *United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007) (quoting *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978)). "For purposes of analysis under Rule 8(a)," however, "no one characteristic is always sufficient to establish 'similarity' of offenses, and each case depends largely on its own facts." *Blakney*, 941 F.2d at 116 (internal quotation marks omitted).

Rule 14 of the Federal Rules of Criminal Procedure provides that where joinder "appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Prejudice under Rule 14 must be viewed through the lens of the strong presumption in favor of joint trials. *Richardson v. Marsh*, 481 U.S. 200, 210 (1987). In order to prevail on a severance motion under Rule 14, "the defendant must show not simply some prejudice but substantial prejudice." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quoting *Werner*, 620 F.2d at 928 (internal quotation marks omitted)). "Substantial prejudice" means "'prejudice so great as to deny [the defendant] a fair trial.'" *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (quoting *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991)). "Granting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two

crimes rather than one, would reject the balance struck in Rule 8(a), since this type of 'prejudice' will exist in any Rule 8(a) case." *Sampson*, 385 F.3d at 190.

Indeed, Rule 8(a) already "recognizes the adverse effect on the defendant by a joinder of counts, but considers this to be outweighed by gains in trial economy." *Werner*, 620 F.2d at 929. Accordingly, "[a] defendant has the 'extremely difficult burden' of showing that he would be so prejudiced by joinder that he would be denied a fair trial." *United States v. Tuzman*, 301 F. Supp. 3d 430, 440 (S.D.N.Y. 2017) (quoting *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989)). The defendant must show "that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (quoting *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984)). "Such a showing is unlikely where 'proof at separate trials would largely overlap.'" *United States v. Brozyna*, 571 F.2d 742, 747 (2d Cir. 1978) (quoting *McGrath*, 558 F.2d at 1106). Rule 14 "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *United States v. Page*, 657 F.3d 126, 130 (2d Cir. 2011) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). "[I]n those rare instances where a defendant establishes a 'high' risk of prejudice, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *Tuzman*, 301 F. Supp. 3d at 440 (quoting *Zafiro*, 506 U.S. at 540).

Finally, it is "well-recognized . . . that joint trials serve the public interest in economy, convenience, and the prompt trial of the accused." *Turoff*, 853 F.2d at 1039. In fact, "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring

victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying." *Richardson*, 481 U.S. at 210.

### 2.      Discussion

#### a.      The Counts in the Indictment Are Properly Joined

The charges contained in the Indictment satisfy the joinder requirements under Rule 8(a). There is a sufficient logical connection between the hoax offense and the child pornography possession to warrant joinder in the same trial. *See Ruiz*, 894 F.2d at 505. The two charged offenses share a "logical connection" in that the proof of each crime (both the hoax and the CSAM possession) will include some of the same evidence, and the factual narrative underlying both counts is intertwined. For example, to prove each count, the Government would offer testimony from Victim-1 regarding the defendant's prior CSAM possession, both to establish how the defendant knew and later targeted Victim-1, and also as probative evidence of the defendant's possession of CSAM as charged in Count Two, under Fed. R. Evid. 414(a). Additionally, the Government would also introduce the defendant's recorded statements on jail calls with his mother in which he generally confessed to the offense conduct underlying both counts. Furthermore, the evidence proving both counts is, in multiple respects, "interconnected and overlapping" over a short period of time, including because the CSAM was discovered in the course of, and pursuant to a warrant based on, the investigation of the powder letter—which, in turn, was related to the defendant's prior possession of CSAM, which would feature in the Government's proof on both counts. *See Amato*, 15 F.3d at 236. Therefore, a joint trial in this case "conserves judicial resources, alleviates the burdens on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials." *United States v. Lyles*, 593 F.2d 182, 191 (2d Cir. 1979) (citation omitted); *see also Werner*, 620 F.2d at 928 (the purpose of Rule 8(a) is to address "trial convenience and economy of judicial and prosecutorial

resources – considerations of particular weight when the Government and the courts have been placed under strict mandate to expedite criminal trials" (citations omitted)).

b.       **The Defendant Has Not Shown Substantial Prejudice**

The defendant has not carried his burden of showing that he will suffer substantial prejudice from the joined charges. This is largely because even if the trial were severed, similar evidence would be admissible at both trials. This case does not present one of the "rare instances" in which prejudice from properly joined counts is so severe or profoundly unfair as to require severance under Rule 14. Contrary to the defendant's suggestion, there is no actual material risk of jury confusion in a joint trial. The facts in this case are straightforward, and any potential confusion can be addressed by appropriate instructions to the jury, including an instruction that the jury must consider each count separately. *See United States v. Gomez-Reynoso*, 1995 WL 542455, at *3 (S.D.N.Y. Sept. 12, 1995) ("[A]ny potential prejudice to the defendant caused by the joinder of counts will be cured when the Court instructs the jury to consider each count separately and to render a separate verdict on each count.").

Furthermore, even if Counts One and Two were severed for trial, evidence regarding the defendant's prior 2016 CSAM possession would be admissible in each case. The defendant's severance argument depends heavily on claims of substantial prejudice from the introduction of "otherwise inadmissible" evidence of his 2016 CSAM possession. (Def. Sev. Mot. at 13.) But the defendant overlooks Rule 414, which provides that "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." As such, Rule 414 specifically "allows for the admission of prior convictions or prior acts of child molestation to prove propensity." *United States v. Davis*, 624 F.3d 508, 512 (2d Cir. 2010). And Rule 414(d)(2) defines "child molestation" as a "crime under federal law or under state law

. . . involving," *inter alia*, "any conduct prohibited by 18 U.S.C. chapter 110," which includes 18 U.S.C. § 2252A, under which the defendant was convicted in 2016 for CSAM possession. *United States v. Archambault*, 740 F. App'x 195, 200 (2d Cir. 2018) (defendant "does not dispute that 18 U.S.C. § 2252A(a)(5)(B), the crime of his prior conviction, is "conduct prohibited by 18 U.S.C. chapter 110"); *United States v. Spoor*, 904 F.3d 141, 154-55 (2d Cir. 2018) (explaining Rule 414 makes propensity a "permissible" inference and that prior conviction evidencing the defendant's "sexual interest in children was also relevant to the [CSAM] possession counts"). The fact that evidence of the defendant's 2016 CSAM possession conviction would be admissible in separate trials seriously undermines the defendant's claim of unfair prejudice. *See United States v. Haynes*, 16 F.3d 29, 32 (2d Cir. 1994) (severance improper where claims of prejudice were rooted in evidence that would be admissible in a separate trial); *cf. United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (prior act evidence admissible under Rule 403 analysis when it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged").

The defendant's remaining claims of substantial prejudice at a joint trial fail for similar reasons. As explained above, the evidence at the severed trials would be overlapping in significant respects. Moreover, there is no serious risk of "prejudicial spillover" because both counts necessarily involve the defendant's child pornography possession and what the defendant concedes is the "abhorrent" conduct in sending a threatening powder-filled letter to the FBI agent who investigated him for that very conduct. *See Amato*, 15 F.3d at 237 ("Given this overlap in evidence and the court's repeated cautionary instructions to the jury limiting the use that the jury could make of the war evidence, we find no merit in the claim of prejudicial spillover."). As discussed above, in presenting evidence on the hoax threat, the Government would seek to

43

introduce evidence and testimony from Victim-1 regarding his prior investigation and interview of the defendant relating to CSAM possession, as well as his 2016 CSAM possession conviction. That same evidence would be admissible, including to prove propensity, on the CSAM possession charges in Count Two. Given that the hoax trial already involves "unquestionably disturbing" conduct that will include evidence of a prior child pornography conviction, there is nothing more inherently prejudicial in also trying the defendant on his subsequent CSAM possession.

At bottom, the defendant is asking the Court to waste judicial resources by allowing him two opportunities to attack the presentation of largely similar and overlapping evidence. This is improper. The Court should exercise its discretion and deny the defendant's motion to sever.

### F. No Evidentiary Hearing Is Necessary

There is no material dispute of fact in the motions before the Court, as set forth above. Accordingly, the defendant's single sentence request for an evidentiary hearing should be rejected. No hearing is necessary on any issues of fact.

## IV.    <u>**CONCLUSION**</u>

Accordingly, for the reasons set forth above, the Court should deny the defendant's motions without an evidentiary hearing.

Dated:     New York, New York
           June 2, 2023

                                   Respectfully submitted,

                                   DAMIAN WILLIAMS
                                   United States Attorney
                                   Southern District of New York


                         By:     _____/s/_____
                                   Matthew J.C. Hellman / Nicholas S. Bradley
                                   Assistant United States Attorneys
                                   (212) 637-2278 / -1581