N6RKLANC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        22 CR 590 (PKC)
                                         15 CR 723 (PKC)
5  OKAMI LANDA,

6                                        Conference
                  Defendant.
7  ------------------------------x

8                                        New York, N.Y.
9                                        June 27, 2023
                                         12:00 p.m.
10

11 Before:

12                    HON. P. KEVIN CASTEL,

13                                       District Judge

14                    APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   MATTHEW HELLMAN
17 NICHOLAS BRADLEY
        Assistant United States Attorneys
18
   DAVID PATTON
19 FEDERAL DEFENDERS OF NEW YORK, INC.
        Attorney for Defendant
20 BY:  MICHAEL ARTHUS

21 Also Present:

22 Jonathan Bressor, U.S. Probation
   Jill Hoskins, Spanish Interpreter
23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N6RKLANC

```
1            (Case called)

2            MR. BRADLEY:  Good afternoon, your Honor.  Nicholas

3    Bradley, for the government, along with Matthew Hellman.  And

4    also at counsel table is Jonathan Bressor, from the United

5    States Probation Office.

6            THE COURT:  Good to see you all.

7            And for the defendant?

8            MR. ARTHUS:  For Mr. Landa, Michael Arthus, Federal

9    Defenders.  Good afternoon.

10           THE COURT:  Good afternoon, Mr. Arthus.

11           And good afternoon, Mr. Landa.

12           So the first order of business:  With regard to the

13   motion to suppress, does the defendant seek an evidentiary

14   hearing?

15           MR. ARTHUS:  There doesn't appear to be any factual

16   dispute in the motion, so, no.

17           THE COURT:  And that's the view of the government as

18   well?

19           MR. BRADLEY:  Yes, your Honor.

20           THE COURT:  All right.

21           I can see why you reached that conclusion.  Based on

22   my review, it seems that the parties are pretty close on this.

23           There are a number of moving parts on the motion to

24   suppress.  It is well established that there is an exception to

25   the warrant requirement in circumstances of special needs
```

N6RKLANC

1    beyond the normal need for law enforcement, and the special

2    needs exception would apply to a person on supervised release,

3    particularly where there has been a search condition, and, as I

4    understand it, there was a search condition in the judgment

5    that was entered arising out of the 2016 conviction.

6         So the question becomes — at least we're not up to the

7    search warrants yet, but we're up to the initial search —

8    whether the officer, the probation officer, had, based on the

9    totality of the circumstances, a reasonable suspicion.  And

10   that requires an analysis of whether there was a particularized

11   and objective basis to suspect the person searched of criminal

12   activity.  And a mere hunch is insufficient, but the likelihood

13   of criminal activity need not rise to the level required for

14   probable cause, and it falls considerably short of satisfying a

15   preponderance-of-the-evidence standard.

16        So, Mr. Arthus, this is what I propose to do.  I want

17   to see whether this makes sense to you, it makes sense to the

18   government.

19        The first thing I'm going to do is have the government

20   lay out the basis for reasonable suspicion leading to the

21   initial search by the probation officer, and to describe the

22   fruits of that search, what it was and what it showed.  I'll

23   then give Mr. Arthus an opportunity to respond, and we can then

24   move on to similar inquiries with regard to the search warrant.

25        Does that make sense to you, Mr. Arthus?

N6RKLANC

1          MR. ARTHUS:  That makes sense.

2          The only note I would make:  I wasn't certain, coming

3     in, that we were actually going to be having oral argument

4     today, so I'm not wholly -- I can try.

5          THE COURT:  All right.  Excellent.

6          So let me hear from the government.

7          MR. BRADLEY:  Yes, your Honor.

8          And I will just note for the record that what I am

9     about to lay out in terms of the undisputed facts that were

10    within the knowledge of the probation officer are set forth in

11    the government's opposition brief, specifically pages 12 to 13,

12    again, just for the transcript.

13         But at the time of the probation search of the

14    defendant's apartment, which the government referred to as the

15    residence in the Bronx, it's undisputed that the probation

16    office knew the following facts:

17         First, that an FBI agent in the sex crimes unit of the

18    New York field office of the FBI received a letter on or about

19    November 15th, 2021, containing threatening language and a

20    white powder substance.  The stamp that was used to send that

21    letter was purchased using a credit card belonging to the

22    defendant's mother, who lived with the defendant at the

23    residence.  That information was also known to the probation

24    officer and the probation office due to the defendant's

25    supervision, that he was registered specifically at that

N6RKLANC

1   residence with his mother.

2          Next, that the FBI interviewed the defendant at his

3   residence regarding the letter, and in the FBI interviewing

4   agent's assessment, the defendant's explanation regarding

5   provenance of the stamp did not make sense.

6          Next, your Honor --

7          THE COURT:  He said that his mother had purchased the

8   stamp and gave it to someone who she didn't know?  Was that the

9   explanation?

10         MR. BRADLEY:  That's correct, your Honor.  Yes, in

11   general, that was the effect.

12         There was also discussion about the location of where

13   the stamp was purchased, and, again, the FBI agent had also

14   noted that that particular location that was proffered by the

15   defendant did not make sense as well.

16         THE COURT:  All right.

17         It did not make sense because it didn't match up with

18   what the credit card showed?

19         MR. BRADLEY:  Correct, your Honor, the purchase

20   records associated with that stamp on it.

21         THE COURT:  Okay.  So I'm processing this.  That's a

22   very tangible discrepancy.

23         So the agent knew where the stamp was purchased from

24   the credit card receipt.  That's what you're proffering?

25         MR. BRADLEY:  That's correct.

N6RKLANC

1          THE COURT:  And the place where the defendant said the

2     stamp was purchased did not match that record?

3          MR. BRADLEY:  Correct, your Honor.

4          THE COURT:  Okay.  Go ahead.

5          MR. BRADLEY:  And the bottom line is that what the

6     probation office was told from the FBI was that the defendant's

7     explanation regarding the stamp did not make sense in the FBI's

8     assessment.

9          THE COURT:  Right.

10          MR. BRADLEY:  And then next, your Honor, that the

11     probation officer was aware at the time that the defendant had

12     previously made threats against the United States Government,

13     including statements regarding blowing up Federal Plaza, which

14     is the location of the New York field office of the FBI.

15          And, finally, the probation office -- obviously, the

16     probation officer obviously knew that the defendant was subject

17     to a search condition under his terms of supervised release --

18          THE COURT:  Let me just ask a question about the prior

19     threat.

20          That was learned from the Bureau of Prisons?  Is that

21     how he learned it?

22          MR. BRADLEY:  That's correct, your Honor.

23          THE COURT:  And how, in the ordinary course, would the

24     probation officer know that?

25          MR. BRADLEY:  That information was communicated to law

N6RKLANC

1   enforcement from the Bureau of Prisons as, frankly, a security

2   measure, after it was made, because at the time the defendant

3   made the statement, and I believe this is reflected in one of

4   the exhibits that Mr. Arthus attached to the severance motion,

5   the defendant was coming up to either his halfway house

6   placement or the conclusion of his term of imprisonment on his

7   prior case.

8           THE COURT:  So the BOP alerted, what, the FBI, and the

9   FBI told the probation office?  Is that the chain of

10  communication?  Or was it from the BOP directly to the

11  probation officer?

12          MR. BRADLEY:  If I may, your Honor?

13          THE COURT:  Yes.

14          (Pause)

15          MR. BRADLEY:  Your Honor, that information came

16  directly from the Bureau of Prisons to the probation office.

17          THE COURT:  Okay.  Excellent.  Thank you.

18          MR. BRADLEY:  That is the total mix of information

19  that was available and known to the probation officer at the

20  time of the search.  That probation search, pursuant to the

21  search condition, occurred on November 30th of 2021.  The

22  results or the fruits of that search, your Honor, included,

23  among other things, an orange prescription bottle containing a

24  powder substance, also two standard business size envelopes, a

25  Dell laptop, and also the SanDisk brand USB drive.  That USB

N6RKLANC

1    drive was later searched by what was the subject of what the

2    government referred to as the devices warrant in which the FBI

3    subsequently determined it contained CSAM.

4                THE COURT:  Anything else on reasonable suspicion for

5    the residence search?

6                MR. BRADLEY:  No, your Honor.

7                THE COURT:  All right.

8                Mr. Arthus?  And I am familiar with your papers, so --

9                MR. ARTHUS:  Yes.  Just to summarize, I'll give it a

10   very brief summary here.

11               THE COURT:  Yes.

12               MR. ARTHUS:  As the Court said, it's all laid out in

13   the papers.

14               The statute here that the search was conducted as a

15   violation of, the false information and hoaxes, requires that

16   there actually be the conveying of false information about —

17   and the statute has like a hundred different subsections, but

18   the relevant one here is bioterrorism.  The government's theory

19   here is that it was anthrax that was in the envelope or fake

20   anthrax that was in the envelope.

21               But the actual language of the letter here — and

22   that's what makes this different from so many other cases that

23   the government relied on — the actual language of the letter

24   identifies what the substance is supposed to supposedly be,

25   which is cocaine, and that does not violate the false

1    information and hoaxes statute.  I want to be crystal clear on

2    this.  No one is saying that this was a good or appropriate

3    letter to send — I think I was pretty explicit in my motion

4    about how distasteful this letter was — but at the time, there

5    was no reasonable suspicion that it violated the laws that

6    probation felt that it violated.

7          So, in that respect, there was then no reasonable

8    suspicion to conduct a search because a probationer has reduced

9    expectations of privacy, but the act of sending a distasteful

10   letter does not authorize probation to then search someone's

11   apartment.

12         So that's the summary of the reasonable suspicion

13   argument.

14         THE COURT:  All right.  Let me pause --

15         MR. ARTHUS:  Sure.

16         THE COURT:  -- because this is kind of the 800-pound

17   gorilla here.

18         MR. ARTHUS:  Sure.

19         THE COURT:  In the context of the information that was

20   known from the Bureau of Prisons about the prior threat, and in

21   the context of the statement that — and I'm eliding language

22   that's not necessary here — hope you and your ugly children and

23   family get what you deserve, a slow, painful and terminal

24   disease to end your sorry life, and then it says:  Happy New

25   Year.  Here is some snow/sugar for your nose, you corrupt, ugly

N6RKLANC

1    blank.

2        So that is stated.  And as I understand the argument —

3    and I get it, I think — it's didn't you read what he said?

4    Snow is slang for cocaine.  He told you it's cocaine.  So what

5    on earth gives you reasonable suspicion of anything else?

6        MR. ARTHUS:  Yes, because what has to be established

7    is both that he intended to convey false information, so

8    actually saying what was -- it was supposed to be goes to his

9    intent.  It also goes to the ability of someone to reasonably

10   believe what was in there was actually --

11       THE COURT:  So now let's think about this.

12       You're a special agent of the FBI, and you receive

13   this.  And in the context of the prior threats, why on earth

14   would you, a special agent of the FBI, take at face value the

15   writer's claim that this is cocaine or sugar?  Why would you

16   take it at face value?

17       MR. ARTHUS:  I would have two responses to that.

18       The first, I don't think that there's been an

19   allegation from the government that the special agent at the

20   FBI knew about the prior threats, or at least I haven't seen

21   that that was explicitly communicated to him.  Correct me if I

22   am wrong, but I believe that was communicated during the course

23   of the investigation from probation to the FBI.  I don't

24   believe that the special agent, when he opened it, knew about

25   those prior threats, at least I haven't seen that, but that

N6RKLANC

1    could be -- either way, the fact is — and this comes up in the

2    white powder cases, and this is the whole context of white

3    powder — sending white powder is not criminal, per se, and that

4    would effectively convert any sending of white powder into a

5    crime, and that's not here.

6            THE COURT:  No, but it's the false hoax thing.

7            MR. ARTHUS:  Yes.  So if I send an envelope with white

8    powder, and I say this is white powder, this is just white

9    powder, it's not anthrax, a person could believe that it's

10   anthrax, but that would not be a reasonable position.

11           THE COURT:  So this is kind of my hypothetical.

12           MR. ARTHUS:  Yes.

13           THE COURT:  So what if the letter said, I want you to

14   know, Mr. Special Agent, who I wish a painful and early death

15   to, that this is cocaine (it's definitely not anthrax...it's

16   cocaine), you maintain that that does not violate the federal

17   hoax statute?

18           MR. ARTHUS:  Absolutely, because there is then no

19   circumstance under which you could send someone white powder

20   that it was not a violation of that statute, and that if that

21   was what the statute is supposed to be, Congress would have

22   passed a law saying sending white powder is illegal.  That's

23   not what this was.

24           THE COURT:  Okay, I get the argument.  I get the

25   argument.  That's the argument.  Okay.

N6RKLANC

1    Let me say, as we go through this, because I think

2    it's appropriate, I find, on the totality of the circumstances,

3    that there was a particularized and objective basis, on the

4    part of the probation officer, to suspect the defendant of

5    criminal activity.  It was more than a mere hunch, and it was

6    particularized.

7    The probation officer knew of the threats communicated

8    by the defendant and was known to the Bureau of Prisons.  And

9    the probation officer knew of the letter and the existence of a

10    white powder in that letter to the special agent of the FBI,

11    and could reasonably suspect — he doesn't need to reasonably

12    conclude, but reasonably suspects — that the intent of the

13    communication was to communicate that a harmful biological

14    material, known as anthrax, was in the envelope, and that the

15    probation officer would be quite appropriately skeptical of a

16    claim by the defendant that this is not biological material,

17    this is not anthrax, this is cocaine.

18    So I conclude that there was, in the view of the

19    search condition that existed in the 2016 judgment of

20    conviction, a basis for reasonable suspicion to conduct the

21    search of Mr. Landa's residence at that time.

22    Now, let me hear the government with regard to the

23    first search warrant.

24    MR. BRADLEY:  Thank you, your Honor.

25    With regard to the search warrants, there were three

N6RKLANC

1      of them in total, the first -- it may make sense to talk about

2      the first two because they were --

3              THE COURT:  Okay, that's fine.

4              MR. BRADLEY:  -- sworn out on the same day, your

5      Honor.  But, in general, the two search warrants set forth

6      probable cause based off of facts that were largely set forth

7      in the government's opposition brief.  But, in general, the

8      facts were that, much as I summarized earlier regarding the

9      probation search, there was a letter with powder that was

10     threatening, and the text and photograph of that letter was

11     included in the search warrant affidavit.  It was sent to a

12     special agent who had previously been involved in an FBI

13     investigation of the defendant.

14             The stamp on that letter, or that envelope, had been

15     traced back to a credit card in the defendant's mother's name,

16     and registered at the defendant's mother's address, where the

17     defendant lived, and also described the results of the

18     probation search that I mentioned earlier, including the

19     recovery of a USB drive, the recovery of the laptop, also the

20     envelopes, the powder substance in an orange bottle, and then,

21     also, the defendant's statements to the probation officer at

22     the time of the search admitting that he had been using his

23     mother's laptop, in violation of his conditions of supervised

24     release.

25             THE COURT:  When did that admission took place?

N6RKLANC

1    MR. BRADLEY:  That took place during the probation

2    search, your Honor, on November 30th of 2021.

3        In addition to that, your Honor, the affidavit -- I

4    mention all this in the context of what we describe as the

5    premises search warrant, but the affidavit also described how,

6    during the probation search, the probation officers observed,

7    documented, but did not seize, additional evidence that

8    included printing cartridges and also a typewriter.  And,

9    obviously, at the time, the government and the FBI was

10   continuing its investigation of the provenance of the

11   threatening letter that was sent to the FBI agent.

12       Those facts are essentially repeated in their entirety

13   with regard to the laptop and USB drive warrant, including the

14   fact that, as I mentioned earlier, the defendant had admitted

15   during the probation search that he had been using electronic

16   devices in violation of his probation conditions.

17       THE COURT:  Okay.

18       So now, Attachment A describes the devices subject to

19   search and seizure on the device warrant.  This is the warrant

20   of — let me get the date of this.

21       MR. BRADLEY:  I believe it's December 3rd, 2021, your

22   Honor.

23       THE COURT:  Okay.

24       Now, what is the warrant of December 17th, then?

25       MR. BRADLEY:  The December 17th warrant, your Honor,

N6RKLANC

1   which the government referred to as the devices warrant, was a

2   separate --

3             THE COURT:  So the December 3rd also seems to be a

4   devices warrant.

5             MR. BRADLEY:  Correct.

6             THE COURT:  So they're both devices warrants.

7             MR. BRADLEY:  Correct.  And just for context, your

8   Honor, the December 3rd warrant was limited to the laptop, the

9   Dell laptop, and the USB drive that were seized by the

10  probation office during the probation search.  And the

11  December 17th --

12            THE COURT:  I see.

13            So it was the black Dell Inspiron 3502 laptop and the

14  black SanDisk USB thumb drive?

15            MR. BRADLEY:  Correct, your Honor.

16            THE COURT:  And it was in the possession of law

17  enforcement, but, prudentially, you were securing a search

18  warrant to be able to examine the contents?

19            MR. BRADLEY:  Correct, your Honor.

20            THE COURT:  All right.

21            Now take that to December 17, which also refers to the

22  Dell Inspiron and the black SanDisk USB along with other

23  things.

24            MR. BRADLEY:  That's correct, your Honor.  In that

25  case, the additional devices, on top of the laptop and USB

N6RKLANC

1    drive, were various electronic devices that were seized by

2    the FBI during the premises search warrant pursuant to the

3    December 6th --

4              THE COURT:  December 3rd.

5              MR. BRADLEY:  -- excuse me, December 3rd search

6    warrant.

7              That search, as set forth in the --

8              THE COURT:  I see.

9              So you now have additional searchable data storage

10   devices that have been seized as a result of the December 3

11   search warrant.  So there actually was a physical search above

12   and beyond just the Dell laptop and the USB drive that resulted

13   from the December 3 warrant; is that correct?

14             MR. BRADLEY:  That's correct, your Honor.

15             And, again, just so the record is clear, there were

16   two search warrants that were sworn out on December 3rd.

17             THE COURT:  I see.

18             MR. BRADLEY:  The first was for the defendant's

19   residence.

20             THE COURT:  I see.

21             MR. BRADLEY:  That was a premises search warrant.

22             And the second was for those two electronic devices

23   that were mentioned.

24             THE COURT:  I see now.

25             And let me just look at the description of the place

N6RKLANC

1        to be searched and what was being searched for.

2                    There's a photograph of the apartment door, 6J,

3        et cetera, and a description of that which they were seeking.

4        Okay.

5                    So now there is the December 17 warrant.  Was that

6        devices only, or device and residence?

7                    MR. BRADLEY:  That was devices only, your Honor.  It

8        was limited to not only the laptop and USB, which I'll get to

9        in a moment, but also the additional devices, including an

10       iPad, another tablet device, multiple cell phones, and digital

11       cameras that were seized during the search pursuant -- of the

12       residence pursuant to the December 3rd warrant.

13                   I should note, your Honor, that that warrant, and the

14       reason why the laptop and the USB drive appeared again in that

15       December 17th warrant, was to add an additional probable cause

16       for an additional offense, specifically because the FBI's

17       search of the thumb drive, the USB drive, on December 3rd

18       uncovered evidence of CSAM, which is set forth in the

19       December 17th warrant.

20                   THE COURT:  So that's what was of particular note that

21       was new in the December 17 warrant application?

22                   MR. BRADLEY:  Correct, your Honor.

23                   THE COURT:  Are those the three warrants, or is there

24       an additional warrant beyond that?

25                   MR. BRADLEY:  Those are the three warrants, your

N6RKLANC

1    Honor.

2            THE COURT:  All right.

3            So now let me turn to Mr. Arthus and give him an

4    opportunity to expound.

5            MR. ARTHUS:  We're starting with the apartment

6    warrant, I'll begin with.

7            So, as the Court saw in the motion, there are several

8    grounds that we raise.  The initial one is that there was not

9    probable cause to believe a crime had been committed.  So, to

10   the extent that the Court's previous ruling about the probation

11   search relied on reasonable suspicion, obviously we have the

12   same argument, but now saying that it doesn't rise to that

13   higher probable cause standard.

14           Additionally, though, there are some interesting facts

15   about that apartment warrant, including the fact that the

16   apartment had already been searched by probation when that

17   warrant was issued.  And there are no fact-specific allegations

18   in this warrant that justify thinking that probation missed

19   anything during what was apparently a fairly thorough search.

20           Most of the warrant and most of all of these warrants

21   are relying principally on the agent's, quote-unquote, training

22   and experience.  That's language that just is repeatedly used.

23   And while that's certainly relevant to a search warrant

24   application, it can't be the be all and end all.  Agents can't

25   just say in my training and experience, things have been hidden

N6RKLANC

1    in ceiling tiles before, therefore, we should be able to move

2    the ceiling tiles in this apartment.  In fact, there's no

3    allegation in the warrant that probation did not move the

4    ceiling tiles.

5            So the apartment search was largely seeking a warrant

6    to conduct what was effectively a duplicative search of what

7    probation had already done to look for additional evidence.

8            Also, I won't go into every single -- the Court has

9    read the warrants and has read the motions, but it was also

10   overbroad, and it lacked particularity, for the reasons we laid

11   out.  It was allowing, effectively, a roving search of things

12   that could not possibly have been related to the false

13   information and hoaxes charges.

14           So, that's the apartment warrant.  Does the Court want

15   me to move on to the USB warrant, just do it at all once?

16           THE COURT:  That would be fine, yes.

17           MR. ARTHUS:  So the USB warrant, in particular -- I'm

18   going to call it the USB warrant because the USB is the main

19   thing in this case.

20           THE COURT:  Yes.

21           MR. ARTHUS:  There are no fact-specific allegations

22   here that the USB drive contained any evidence of false

23   information or hoaxes.  Again, it's all about training and

24   experience.  And even if we take that training and experience

25   as meaningful, the allegation was that the USB drive might

N6RKLANC

contain personal information about the agent, but there's no

reason to think that that personal information even existed on

the internet.  In fact, I've Googled Agent Spivak.  There is no

personal information about him on the internet that could

possibly have existed on that USB drive.

THE COURT:  But that assumes that any personal

information about the agent necessarily must come from the

internet.

MR. ARTHUS:  I think that was the allegation in the

warrant, was that he must have used the computer to research

personal information about the agent and then saved it on the

USB drive — that was one of the allegations — as well as the

allegation that drafts of the letter might be saved on the USB

drive.  In that respect, the USB drive was not connected to the

computer; it was found in a different area of the room.  There

is just no connection between the -- it's not even said in the

warrant that the USB drive was actually compatible with that

computer, so in that respect, there wasn't a basis to search

the USB drive, as well as the fact that it was a fruit of what

we had -- I just want to preserve that issue, that it was a

fruit of the previous unlawful --

THE COURT:  I understand the argument.

MR. ARTHUS:  Yes.

And then the final devices warrant — again, I'm just

giving the highlights here.  This is obviously not everything

N6RKLANC

1    in our motion.  The final devices warrant was effectively

2    duplicative of the other warrant, so the same exact arguments

3    go to the final devices warrant.  It's effectively the same

4    warrant, just adding in allegations related to child

5    pornography at that point.

6           So the Court has all of our other arguments.  I don't

7    need to go into detail about everything that was in the

8    motions.

9           THE COURT:  Thank you.

10          And I understand the fruits argument applies to all

11   three warrants?

12          MR. ARTHUS:  Yes.

13          THE COURT:  Yes.

14          I find that there was probable cause laid out in the

15   application for the two warrants issued on December 3 by

16   Magistrate Judge Debra Freeman.  Specifically, it was not

17   duplicative in the following respects:  The training and

18   experience of a special agent of the FBI is unique.  There is

19   no reason to believe that a probation officer — who is part of

20   the judicial branch of government, works for the court, not for

21   any special law enforcement agency — would have the same

22   motivations or experience in conducting a search.  Their job is

23   to find and consider whether there has been a violation of the

24   court-ordered terms of supervised release.

25          Now, that does include, and would include, the

N6RKLANC

violation of a federal, state, or local law.  That could be a

ground for violating the terms of supervised release.  In

contrast, the special agent of the FBI is investigating under a

general criminal statute.  And the three statutes that are

cited are:  18 U.S.C. 875(c), interstate threats; 876(c),

mailing a threatening communication; and 1038(a), false

information and hoaxes.  And the culmination of information,

including what I have already outlined, gave rise to probable

cause, and this was all before the magistrate judge, including

the records of the United States Postal Inspection Service and

the credit card, which gave law enforcement, and ultimately the

magistrate judge, a basis to believe that Landa had given false

information to law enforcement.

So that strikes me as sufficient in the totality of

the circumstances laid out in the warrant.

And, further, with regard to the USB drive, the term

"USB" almost defines itself.  It is a recognized and common

means of connecting to a port in commonly sold laptops.  It

would be like requiring a better explanation that an electrical

plug goes into an electrical outlet or a telephone plug goes

into a telephone jack.  A USB drive is commonly understood to

be insertable in most commonly sold laptop devices.

Looking at the premises or residence warrant, the

location is particularized, the evidence that's being sought is

being particularized, and that's true with the two device

N6RKLANC

warrants as well.  Of course, when it comes to the second

device warrant, at that point, the government had the fruits of

the search of the USB drive and, therefore, had good probable

cause to believe that there may be evidence of possession of

child pornography on other electronic devices.

So, considering all of the arguments raised in

defendant's papers, including those not addressed today, on the

record, or in the Court's oral findings, the Court concludes

that the motion to suppress is denied.

Now, there's a motion to sever.

The motion to sever proceeds from the premise that the

defendant should have a separate trial of the false hoax charge

separate from the child pornography charge.  It argues that the

two charges are not similar, and that it will be prejudicial to

include them in the same indictment.

The government comes back and says, well, in the false

hoax trial, it's inevitable that at least the prior conviction

for child pornography will come out, and, of course, the

defense says that's not necessarily inevitable.  But I want to

hear the parties on that point in particular and anything else

you want to tell me on the severance motion.  And I will let

the government go first.

MR. BRADLEY:  Thanks, your Honor.

I do want to answer the Court's question, but also

just to place it in context.

N6RKLANC

1          THE COURT:  That's fine.

2          MR. BRADLEY:  Your Honor, unlike the cases that the

3    defendant cited in his motion, many of which involve counts

4    involving CSAM and then counts involving not CSAM, such as a

5    gun possession or something along those lines, this is a case

6    in which joinder is appropriate because, in the government's

7    view, the evidence is inextricably intertwined.  And it's part

8    of the same core set of facts regarding the defendant's

9    conduct, engaged out of the defendant's own apartment, in a

10   short period of time, while he was on supervised release.  The

11   government certainly believes this meets the liberal standard

12   of Rule 8(a), including that it meets the general likeness

13   that's necessary to, for example, show a common plan.

14          The significant overlap in evidence reinforces the

15   judicial economy in a joint trial that the public interest

16   would serve here, and also the nonoverlapping evidence, the

17   government believes, would be quite minimal.  A combined trial,

18   in the government's view, would probably take less than a week,

19   your Honor.

20          With regard to the prior CSAM conviction specifically,

21   it's a very good example.  First of all, a lot of that, your

22   Honor, coheres not just around the fact of the conviction, but

23   also the defendant's statements to the FBI agent, who later

24   received the powder letter back in 2015.  As the Court knows

25   from the government's opposition brief, that FBI agent

N6RKLANC

interviewed the defendant pursuant to a search warrant back in
2015.

During that search, the defendant engaged in a
voluntary interview and made a number of statements that both
admitted to his role in possessing CSAM, his preferences about
consuming CSAM, what types of CSAM that he liked.  He
specifically said little girls.  He also noted how he kept and
organized it, and kept it alongside adult pornography, and also
noted his interest in anime, which is a form of Japanese
cartoons.

He also made statements to the FBI agent minimizing
his role in the offense conduct and saying that he did not
believe anything should happen to him, and that he also thought
that because, in part, he should get a warning because he
wasn't making any money off of this.  So, in other words, he
didn't believe he was hurting anyone, he should be left alone.

All of those facts, your Honor, the government
respectfully believes should come in in both trials or with
respect to both counts.  With regard to the CSAM charges here,
in 2021, it's clear from the defendant's opposition brief that
the defendant has placed in issue his knowledge of the
possession of the USB drive.  The one fact that he placed in
dispute was an affidavit he submitted, the defendant submitted,
denying that he made any statements to Officer Bressor
regarding the USB drive or any statements about his knowledge

N6RKLANC

1    of the USB drive.

2              So that knowledge on the CSAM count will be

3    particularly important, both under Rule 414, in which the

4    government can introduce it for any purpose, including

5    propensity, but also Rule 404(b), to show --

6              THE COURT:  For any purpose other than propensity, is

7    that what you just said?

8              MR. BRADLEY:  No, excuse me, including propensity

9    under Rule 414(a).  My apologies for misspeaking.

10             THE COURT:  Right, okay.

11             MR. BRADLEY:  And then, also, under Rule 404(b), with

12   regard to knowledge, intent, and identity, including, for

13   example, how it was kept, how it was stored, and what, for

14   example, just to use one, your Honor, corroborating the fact

15   that the CSAM on the USB drive in 2021 contained images of

16   prepubescent girls, which is consistent with the statement that

17   he made to the FBI agent back in 2015 regarding his specific

18   preferences for CSAM.  If, for example, it contained images of

19   little boys, one could imagine that he could make an argument

20   about that's not actually his USB drive or something to that

21   effect.

22             With regard to the hoax count, your Honor, those

23   statements to the FBI agent back in 2015 are also direct

24   evidence of the defendant's knowledge, intent, and motivation

25   in targeting the FBI and sending the letter to the FBI agent

N6RKLANC

1  with the powder in it and threatening him.  How else would he

2  know about that agent's identity?  And, also, your Honor, also

3  specifically corroborated by his statements that he believed

4  that he, in effect, was not committing a crime and that he

5  should be left alone.

6      That one example, your Honor, I believe is a very

7  powerful indicator of why joinder is appropriate here and also

8  how, in separate trials, the evidence would be sliced quite

9  thin in order to offer or perhaps redact these statements and

10  offer them for different purposes.

11     I also know, your Honor, that with regard to limiting

12  instructions — and I know Mr. Arthus made a point about that —

13  I believe that just recently as this week, the Supreme Court

14  announced a decision in *Samia* in which Justice Thomas endorsed

15  fullheartedly or wholeheartedly the fact that we must generally

16  rely on jurors to follow instructions and that they generally

17  do so.  And, here, I don't believe that this is a particularly

18  complicated set of facts or a particularly complicated fact

19  pattern for the jury to consider.

20     I think the last point I'll offer, your Honor — and

21  then, again, I'm certainly happy to answer any questions the

22  Court may have or respond to any points that the Court believes

23  appropriate with regard to Mr. Arthus' summation — with regard

24  to the full set of facts at issue in this case, the government

25  respectfully believes that this is not a situation in which,

N6RKLANC

1  for example, a case that Mr. Arthus cited in which a defendant

2  is charged with simultaneous possession of a gun and CSAM.

3  This is a case really, at its core, about the defendant's

4  desire to obtain more CSAM, and it places his actions in

5  context, not only that he's made statements expressing

6  hostility to the U.S. Government, that he was prosecuted in the

7  first place and that he shouldn't have been, that he believed

8  that his possession of CSAM was not something that he should

9  have been punished for, and the fact that, frankly, he sent the

10  letter to the FBI agent involved in the prior investigation of

11  him, that all shows, and is evidence of, the defendant's

12  subsequent possession of CSAM in the instant case.  Why else --

13  it places in context the defendant's actions and why he took

14  the very significant actions that he did.

15         With regard to prejudice, your Honor, under Rule 14,

16  the Court well knows that that prejudice must be substantial.

17  And in a case such as this, your Honor, the defendant is

18  already going to be tried on -- the evidence in this case will

19  already show the defendant had a prior CSAM conviction.  It's

20  very difficult for the government to conceive a scenario in

21  which that would not be the case.  The fact that that's already

22  happened and that bell has already been rung makes it very

23  difficult for the defendant to maintain an argument that there

24  is substantial prejudice on top of that.

25         So for those reasons, your Honor, and for the reasons

N6RKLANC

1    explained in the government's brief, the government

2    respectfully believes that joinder is appropriate and that

3    severance should be denied.

4            THE COURT:  Thank you.

5            Mr. Arthus?

6            MR. ARTHUS:  This may result in some mixing of the

7    misjoinder and the prejudice because some of the arguments

8    overlap.

9            THE COURT:  Understood.

10           MR. ARTHUS:  But what I still am unclear on is why the

11   government is taking the position that if we took the hoax

12   trial in a vacuum, right, the false information and hoaxes, why

13   the words child pornography would ever be uttered at that

14   trial.  If the government's theory is that this letter was sent

15   to an FBI agent because of lingering anger over a previous

16   investigation, that would, in the normal course, be the

17   evidence that was admitted.  We would normally say child

18   pornography is an extremely inflammatory allegation for a jury

19   to learn about and it's not relevant to the false information

20   and hoaxes charges, what the prior investigation was for, as

21   much as simply the fact that there was a prior investigation.

22           THE COURT:  I think that has some appeal to it, what

23   you're arguing.  What I'm hearing from the government — and

24   maybe they're not arguing this — what I'm gathering is that

25   this is not a situation where someone is angry that they were

N6RKLANC

1    prosecuted for a crime; they are arguing, or harbor this

2    belief, that they did the acts that gave rise to the

3    conviction, but believe that they are lawful acts.  And it puts

4    it in a different type of motivation than a garden-variety

5    motivation.

6            In other words, it's not that the defendant is

7    harboring the belief that the special agent fabricated the

8    events, but that the acts were lawful acts, and that at least

9    colors the motivation for the letter.  I don't know if that's a

10   valid argument or not a valid argument, but that's what I hear.

11           MR. ARTHUS:  I think it would be, first, an extremely

12   tenuous argument based on the discovery that I've seen right

13   now.  In fact, I would question, based on the discovery that's

14   been turned over, whether there was even a factual basis for

15   them to make that argument other than some minimizing

16   statements that he had made.

17           But the man pled guilty.  So it's not as though he's

18   taking the position, at any point, that this was not a crime.

19   He pled guilty and served prison time on it.

20           I do really want to emphasize as well, there are no

21   shared elements between these crimes.  There are practically no

22   overlapping witnesses.  In fact, there could be no overlapping

23   witnesses if just the certificate of conviction was entered,

24   even assuming that this was lawfully admissible at both trials.

25           The government has been emphasizing Rule 414, and that

N6RKLANC

1    really -- I take a step back, and I try to imagine what the

2    trial would look like in that circumstance, a joint trial,

3    because Rule 414 would only apply to the new child pornography

4    charges, and could actually be introduced as propensity

5    evidence.  But on the false information and hoaxes charges,

6    typical Rule 404 would apply, and that could not be considered

7    as propensity evidence.  So I understand that limiting

8    instructions are important, but there's a point when they're

9    impossible, and it's impossible to instruct a jury, consider

10   this for propensity, but also not for propensity.  You bring in

11   an entire investigation, the government would bring in an

12   entire investigation into the prior child pornography charges,

13   and how a jury could possibly keep track with all these

14   overlapping now factual allegations about what related to the

15   earlier investigation, what related to the new investigation,

16   why they're even hearing about the earlier investigation,

17   whether or not the evidence is even presented in an order where

18   the two cases are done separately, at the very least, I think

19   that this is a circumstance that would call out for a

20   bifurcated trial, even if not a severed trial, if the concern

21   is about jury selection.  I would think that you would try one

22   first and then the other.  But the overlapping evidence here

23   would be so prejudicial, so inflammatory, a limiting

24   instruction would be so insufficient.  Obviously this goes

25   towards later motions in limine, but our position is that the

N6RKLANC

1    fact that it's a child pornography conviction would be patently

2    inadmissible at the false information and hoaxes trial.  That

3    all speaks towards having these trials separately.

4                THE COURT:  Thank you.

5                I'm going to reserve on the decision for severance,

6    misjoinder, or the like, or bifurcation until the final

7    pretrial conference in this case, at which point I will have a

8    better understanding of what the evidence at the trial, at any

9    joint trial, a separate trial, would look like.  So I'm just

10   going to reserve on that.

11               I'm happy to be informed otherwise, but it seems to me

12   that what I should do is set a schedule for the government's

13   disclosure of 404(b) evidence, any in limine motions, their

14   pretrial submissions, including proposed voir dire and jury

15   instructions, set a date for that, a date for the defendant to

16   respond and submit any motions that they wish to make, and a

17   response to the defendant's motions by the government, and then

18   a final pretrial conference.

19               Does the government agree that's the next step here?

20               MR. BRADLEY:  Yes, your Honor.  Just mindful of the

21   Court's schedule, would the Court be inclined to set a trial

22   date as well, mindful that there is this severance issue still

23   out there, that would be addressed at the final pretrial

24   conference?

25               THE COURT:  I think I probably would schedule the

N6RKLANC

1    final pretrial conference.  That's what I probably would do.

2             And let me hear from Mr. Arthus.  Does that sound

3    right?

4             MR. ARTHUS:  It does.  Just before we move on from the

5    motions, I think I just need a formal ruling on -- there was a

6    dismissal motion, as well, just to preserve it.

7             THE COURT:  Yes.  The basis of the dismissal motion is

8    the facts alleged in the indictment do not amount to a crime,

9    and for much the same reason that I concluded that with respect

10   to reasonable suspicion, that the facts created reasonable

11   suspicion of a violation of the false hoax statute, I also

12   believe the indictment properly charges the crime and that it's

13   a jury question whether or not that crime was committed.

14            So the motion is denied.

15            But thank you, Mr. Arthus.

16            So the government's submissions would be due, unless

17   somebody wants to tell me otherwise, I was thinking of

18   August 4th.

19            Is that reasonable?

20            MR. BRADLEY:  Yes, your Honor.

21            THE COURT:  All right.

22            And the defendant's submissions, mindful that

23   everybody is entitled to time, would it be convenient for the

24   defense to get their submissions in September 8th, Mr. Arthus?

25            MR. ARTHUS:  That's fine.

N6RKLANC

| | |
|---|---|
| 1 | THE COURT:  And then with regard to any in limines by |
| 2 | the defendant, I want to give the government an opportunity to |
| 3 | respond and would make that September 22nd, and then I would |
| 4 | ask my deputy to find us a date for the final pretrial |
| 5 | conference that would be approximately two weeks after that. |
| 6 | MR. ARTHUS:  Just to note, I'm going to be out the |
| 7 | first week of October. |
| 8 | THE COURT:  Okay.  Let's see what we can come up with. |
| 9 | THE DEPUTY CLERK:  October 10th, at 11:00 a.m. |
| 10 | THE COURT:  Does that work for the government? |
| 11 | MR. BRADLEY:  It does, your Honor. |
| 12 | THE COURT:  Does that work for you, Mr. Arthus? |
| 13 | MR. ARTHUS:  Yes, thank you. |
| 14 | THE COURT:  All right.  So that will be the date of |
| 15 | the final pretrial conference. |
| 16 | And I will hear the government's final motion. |
| 17 | MR. BRADLEY:  Thank you, your Honor. |
| 18 | The government would respectfully move to exclude time |
| 19 | under the Speedy Trial Act, pursuant to Title 18 of the United |
| 20 | States Code, Section 3161(h)(7)(A), between today's date and |
| 21 | the date of the final pretrial conference on October 10th of |
| 22 | 2023.  The government would respectfully submit that the |
| 23 | proposed exclusion of time would serve the ends of justice so |
| 24 | that the parties can continue reviewing discovery, brief motion |
| 25 | practice, and prepare for trial. |

N6RKLANC

1          MR. ARTHUS:  No objection.

2          THE COURT:  I find that the ends of justice will be

3    served by granting a continuance until October 10th and that

4    the need for a continuance outweighs the best interests of the

5    public and the defendant in a speedy trial.  The reasons for my

6    finding are that the time is needed to enable the parties to

7    undertake the drafting and filing of the submissions that I

8    have indicated.  It may be that, in some instances, time will

9    be excluded by operation of law under the Speedy Trial Act, but

10   for the avoidance of doubt, I will grant the exclusion.  I find

11   that it's in the best interests of the public and the defendant

12   to grant that exclusion.  And, accordingly, the time between

13   today and October 10, 2023, is excluded under the Speedy Trial

14   Act.

15          Anything further from the government?

16          MR. BRADLEY:  No, your Honor.

17          THE COURT:  From the defendant?

18          MR. ARTHUS:  No.

19          THE COURT:  Thank you, all, very much.

20          (Adjourned)

21

22

23

24

25